Argued and submitted January 7, accused suspended from the practice of law for 120 days, commencing 60 days from date of filing this decision March 24, 2005

In re Complaint as to the Conduct of

# ALLAN F. KNAPPENBERGER,
*Accused.*

(OSB 02-13, 02-14, 02-106; SC S50864)

108 P3d 1161

Peter R. Jarvis, Hinshaw & Culbertson, Portland, argued the cause and filed the briefs for the accused. With him on the briefs was David J. Elkanich.

Stacy J. Hankin, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating Oregon Code of Professional Responsibility Disciplinary Rule (DR) 7-104(A)(1), which prohibits lawyers from communicating with represented parties on the subject of the representation, and DR 5-105(C), which bars former client conflicts.[1] A trial panel of the Disciplinary Board concluded that the accused had violated both rules, and it imposed a 90-day suspension from the practice of law. The accused requested this court's review pursuant to ORS 9.536(1) (2001) and the Bar Rules of Procedure (BRs).[2] We review bar disciplinary matters *de novo*. ORS 9.536(2); BR 10.6.

### COMMUNICATION WITH REPRESENTED PARTIES

The Bar alleges that the accused violated DR 7-104(A)(1) by speaking to two of his employees about an action that they had filed against him.

We find that the Bar proved the following facts by clear and convincing evidence. Four of the accused's employees, including Maddocks and Clark, sued the accused in federal court on employment-related claims. The accused received service of the summons and complaint at his office between 4:30 p.m. and 5:00 p.m. on Friday, March 17, 2000. Thirty to 45 minutes later, the accused confronted Maddocks in her office, showing her the summons and complaint, and asking, in an angry tone, what it was and whose idea it had been. Maddocks told him that they should not be discussing the action. The accused left, insisting that they would discuss the matter the following week. The entire conversation lasted between 30 seconds and one minute.

---

[1] The Bar also charged the accused with violating a third disciplinary rule, but the trial panel concluded that the accused had not violated that rule. We do not discuss that decision because the Bar has not challenged it on review.

[2] The trial panel issued its decision on October 2, 2003. At that time, Oregon law provided for review as a matter of right from trial panel decisions that resulted in sanctions of six months or less. ORS 9.536(1) (2001), *amended by* Or Laws 2003, ch 192, § 4. That statute now provides for review as a matter of right for all lawyer discipline proceedings, regardless of sanction. ORS 9.536 (2003).

Clark was in her office the next day, a Saturday, when the accused entered and tossed a piece of paper at her. He asked her what it was, and she answered that it was the cover sheet of a civil action. The accused asked Clark why she was bringing the action, who had decided to sue him, and whether "this is really what you want to do." Clark told the accused to direct his questions to her lawyer, but the accused said that he had a right to speak with her directly. Finally, when Clark threatened to leave the room if the accused did not discuss work-related matters, he gave her some papers to file and left. The conversation lasted between five and 20 minutes.[3]

Both Maddocks and Clark believed that the accused was trying to intimidate them into dropping the action. Both women described the conversations with the accused to their lawyers, who amended the complaint in the action to include retaliation claims based on the conversations. (The accused ultimately prevailed in the action.)

The Bar alleged that the accused's conversations with Maddocks and Clark violated DR 7-104(A)(1).[4] That rule provides:

"(A)   During the course of the lawyer's representation of a client, a lawyer shall not:

"(1)   communicate or cause another to communicate on the subject of the representation, or on directly related subjects with a person the lawyer knows to be represented by a lawyer on that subject or on directly related subjects, unless:

"(a)   the lawyer has the prior consent of a lawyer representing such other person;

"(b)   the lawyer is authorized by law to do so; or

"(c)   a written agreement requires a written notice or demand to be sent to such other person, in which case a

---

[3] Clark initially asserted that the conversation had lasted between 15 and 20 minutes, but on cross-examination she testified that it could have been as short as five minutes.

[4] The Oregon Rules of Professional Conduct became effective January 1, 2005. Because the conduct at issue here occurred before that date, the Code of Professional Responsibility applies.

copy of such notice or demand shall also be sent to such other person's lawyer.

"This prohibition includes a lawyer representing the lawyer's own interests."

The trial panel concluded that the accused had violated that rule as to Maddocks, but it further concluded, with one member dissenting, that the violation had been *de minimis* because the accused "should not be expected to engage in detached reflection over his ethical responsibilities" immediately after being served with a complaint.[5] However, the trial panel concluded that the accused had violated DR 7-104(A)(1) by speaking with Clark the next day, after he had had time to reflect on the proper course of conduct.

The accused argues that this court should conclude that he should not be sanctioned for either alleged violation of DR 7-104(A)(1) because the communications with Maddocks and Clark were "very brief," because the accused's emotional distress about being sued caused him to act hastily, and because his intent was to determine whether he could continue to work productively with employees who were suing him and not to invade his employees' relationships with their lawyers.

■ Those arguments are insufficient to avoid the conclusion that the accused violated DR 7-104(A)(1) by separately communicating with Maddocks and Clark regarding the subject of their action against him, when he knew that they were represented. The text of DR 7-104(A)(1) provides no exception for otherwise prohibited communications, and the purposes underlying the rule suggest no basis for such an exception. DR 7-104 is a prophylactic rule designed to insulate represented persons "against possible overrreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship, and the

---

[5] The trial panel used the term "*de minimis*" to describe conduct that violated DR 7-104(A)(1) but that should not result in a sanction. The accused also uses that term in his brief. We decline to use that term, because the disciplinary rules do not use the term and because it states a conclusion regarding an alleged violation but does not explain how that conclusion was reached. We find it more useful to focus on the brevity and other aspects of the communication that the accused asserts should lead us not to impose a sanction for conduct that violated the rule.

uncounselled disclosure of information relating to the representation." *The Ethical Oregon Lawyer* § 7.42 (Oregon CLE 1991) (quoting ABA Model Rules of Professional Conduct, Rule 4.2, Comment [1]). All violations of the rule present that risk. Accordingly, this court previously has found violations of DR 7-104(A)(1) even when the prohibited communication was brief, transitory, or not likely to cause serious harm. *See In re Schenck*, 320 Or 94, 879 P2d 863 (1994) (rule violated when lawyer mailed notice to produce directly to adverse party whom lawyer knew to be represented by counsel); *In re Hedrick*, 312 Or 442, 822 P2d 1187 (1991) (rule violated when lawyer sent demand letter directly to represented person, with copy to lawyer).

The accused's related defenses also are unavailing. This court has rejected, as a defense to a charge of improperly communicating with a represented party, the claim that the lawyer and the represented party share a relationship separate from the lawyer's status as a lawyer that requires them to interact with each other regardless of the pending litigation. *See In re Otto W. Heider*, 217 Or 134, 155, 341 P2d 1107 (1959) (rejecting lawyer's defense that improper communication occurred because accused and represented party had business relationship). This court also has held that an accused lawyer's emotional state during the communication is irrelevant. *See In re Lewelling*, 296 Or 702, 706, 678 P2d 1229 (1984) (rejecting accused's justification that he had communicated with represented party "on sudden impulse" when he "was emotionally upset"). Moreover, a lawyer need not intend to violate the lawyer-client relationship of the represented party to violate DR 7-104(A)(1). *See In re McCaffrey*, 275 Or 23, 28, 549 P2d 66 (1976) (direct communication with party lawyer knows to be represented, concerning subject of representation, violates rule even if not done intentionally).

Neither the text of the rule nor this court's cases interpreting it recognize as a defense any of the arguments that the accused makes. The accused's arguments are relevant only in determining the appropriate sanction, and we discuss them in that context below.

We conclude that the Bar has proved, by clear and convincing evidence, that the accused violated DR 7-104(A)(1) with respect to both Maddocks and Clark.

## FORMER CLIENT CONFLICT

■   The Bar also alleges that the accused violated DR 5-105(C) by first representing the husband in a divorce proceeding and later representing the wife in the same divorce proceeding and in a proceeding to overturn a related restraining order.

On *de novo* review, we conclude that the Bar proved the following facts by clear and convincing evidence. On October 4, 2000, Richard Grossman, who was seeking to replace his existing lawyer in a divorce proceeding, met with the accused to discuss representation. Richard asked whether the consultation was confidential, and, although the accused did not provide Richard a direct answer, he did not disabuse Richard of that understanding.[6] Richard provided a copy of a property settlement agreement that he and his wife, Linda, had signed, and he described the main issues in the divorce, including whether Linda could share an annuity that he had purchased after the couple had signed a postnuptial agreement. Richard also told the accused about his goals in the divorce proceeding.

Although Richard was seeking representation only in the divorce proceeding, he also told the accused about the history of Family Abuse Prevention Act restraining orders involving the parties. Richard previously had obtained a restraining order against Linda. At the time Richard consulted the accused, Linda had obtained a restraining order against Richard. The petition that had been the basis for the latter restraining order alleged that Richard had shoved and threatened Linda during a public argument on August 13, 2000. However, Richard described to the accused a different version of those events, saying that Linda had been the aggressor, "yelling" and "screaming" at Richard and his female companion and preventing Richard from getting into his car and leaving. Richard told the accused that he believed Linda had sought the restraining order as a defense to a

---

[6] The accused testified that Richard did *not* ask whether the consultation was confidential, although the accused assumed that it was. Richard testified that he assumed that the consultation was confidential and that he asked the accused whether that assumption was accurate, but that the accused never answered his question directly.

stalking complaint that his companion had filed against Linda. Richard told the accused that Linda had broken into his home sometime after the August 13 incident and that he was concerned because he believed that the police were not being responsive. He said that he was considering obtaining another restraining order against Linda.

On October 12, the accused wrote to Richard expressing a desire to represent him in the divorce proceeding. In a subsequent telephone conversation, however, Richard told the accused that he had decided to retain another lawyer, Urrutia. The accused sent Richard a bill for the October 4 consultation, but Richard never paid it.

On November 21, Richard filed a *pro se* petition seeking a restraining order against Linda and citing the August 13 incident and the break-ins, among other incidents that had occurred in the prior 180 days. The court issued the order on November 22.

Richard did not know, at the time that he filed the petition for a restraining order, that Linda also was seeking a new lawyer because she was dissatisfied with her existing lawyer. On November 30, Linda interviewed the accused, discussed the divorce and restraining order proceedings with him, and retained him to represent her in both those matters. The accused never discussed with Linda the fact that he had consulted with Richard.

Over the next few days, the accused took affirmative steps in connection with his representation of Linda. He wrote to Linda's previous lawyer to request Linda's file, wrote to Urrutia to notify him of the representation and discuss the scheduling of discovery, and requested a hearing to contest the restraining order. He also wrote to Urrutia to request that Linda be allowed to attend a class at Portland Community College (PCC), a location that the restraining order barred her from visiting.

On December 4, Laney, an associate of Urrutia's, notified the accused that he had a conflict in representing Linda because he had consulted with Richard previously. They discussed the propriety of the representation by fax and telephone. Laney requested that the accused withdraw from

representing Linda in the divorce proceeding because he had a conflict of interest as a result of his prior consultation with Richard. The accused said that he did not remember speaking to Richard. However, the accused did not check any records that might have refreshed his recollection. Laney sent the accused a copy of the accused's October 12 letter to Richard as evidence of the meeting. The accused responded by faxed letter that he still did not remember Richard but that he would discuss the issue with his ethics counsel.

During their communications on December 4, Laney and the accused also continued to discuss whether Linda could go to PCC. Laney said that the couple might meet there, and that Richard would consider any contact with Linda, however accidental, a violation of the restraining order. The accused said that he intended to contest in court whether Linda's college attendance violated the restraining order.

On December 5, Laney asked the accused to decide promptly whether he would continue to represent Linda, because a hearing in the divorce proceeding was approaching. The accused responded that he would be meeting with his ethics counsel that day, but he refused to withdraw until after that meeting.

On December 6, the accused informed Urrutia that he would withdraw from representing Linda in the divorce proceeding. He withdrew from the divorce representation on December 8, but he did not withdraw from the restraining order proceeding. Urrutia confirmed the divorce withdrawal by letter, noting that the accused was still "undecided" as to whether he would withdraw from the restraining order matter and requesting that he do so. The accused consulted his ethics counsel a second time. On December 12, he informed Linda that he was withdrawing from that matter as well, and arranged for Linda's previous attorney to resume representing her. Urrutia, who was unaware of the change, threatened to file a motion to disqualify the accused in the restraining order proceeding. On December 18, the other attorney told Urrutia that the accused had withdrawn.

The Bar's complaint charged the accused with violating DR 5-105(C). That provision provides:

"Except as permitted by DR 5-105(D) [regarding consent by both parties after full disclosure], a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict. Matters are significantly related if either:

"(1)    Representation of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in connection with any * * * matter in which the lawyer previously represented the former client; or

"(2)    Representation of the former client provided the lawyer with confidences or secrets as defined in DR 4-101(A), the use of which would, or would likely, inflict injury or damage upon the former client in the course of the subsequent matter."

When evaluating whether a lawyer has violated DR 5-105, we consider all facts that "the lawyer knew, or by the exercise of reasonable care should have known." DR 5-105(B).

The trial panel found that Richard had been the accused's client and that Richard's interests were in conflict with Linda's. It also found that the accused either knew or should have known of that conflict when he met with Linda for the first time and that the conflict was "so obvious * * * that no consultation [with ethics counsel had been] required" on either the restraining order or the divorce proceedings, which were "inextricably intertwined." The trial panel held that "the Accused's failure to recognize the conflict when he undertook to represent [Linda] in both the divorce and [restraining order] matters and his failure to withdraw in a timely manner in both matters when being alerted to the conflict, constitute a violation of DR 5-105(C)."

The accused argues on review that DR 5-105(C) does not apply to this proceeding because that rule applies only to a conflict between a current client and a "former client," and that Richard was not a "former client" of the accused. In the accused's view, Richard was, at most, a "prospective client" of the accused who never became an actual client and, therefore, cannot be a former client. The Bar, relying on OEC 503

and this court's decision in *In re Spencer*, 335 Or 71, 58 P3d 228 (2002), argues that this court should construe the word "client" in DR 5-105(C) to include anyone who consults with a lawyer with a view to obtaining professional services from the lawyer. In the Bar's view, Richard was the accused's "client" for purposes of the former client conflict prohibition of DR 5-105(C), even though he did not retain the accused. For the reasons that we discuss below, although we disagree with the Bar's broad reading of the word "client" in DR 5-105(C) to include anyone who consults with a lawyer with a view to retaining legal services, we conclude that, in this proceeding, the Bar has proved by clear and convincing evidence that Richard was a client of the accused's, at least briefly, and, therefore, that he also was a "former client" for purposes of DR 5-105(C).

In *Spencer*, this court considered whether the requirement in DR 9-101(C)(4) that lawyers "promptly * * * deliver to a client as requested by the client * * * properties in the possession of the lawyer which the client is entitled to receive" applied to prospective clients. This court noted that OEC 503 extends the lawyer-client privilege to persons who consult a lawyer "with a view to obtaining professional legal services from the lawyer," *Spencer*, 335 Or at 83, and concluded that, when a person delivers documents

> "to a lawyer who is considering whether to represent that person, the person has entrusted those materials to the lawyer as a lawyer and, as such, is as much entitled to be considered a 'client' for that limited purpose as if the person had made a confidential, verbal communication to the lawyer."

*Id.* at 84.

As noted previously, the Bar argues that *Spencer* and OEC 503 support its argument that anyone who consults with a lawyer with a view to obtaining legal services should be considered a "client" for conflict of interest analysis under DR 5-105. On the contrary, in *Spencer* this court specifically declined to treat all "prospective clients" as "clients" for purposes of the disciplinary rules and limited its interpretation of "client" there to the use of that term in DR 9-101(C)(4). 335 Or at 84-85 and n 9. *Spencer* does, however, recognize that

this court will consider as evidence that a person is a "client" for purposes of the disciplinary rules whether the putative client intended to establish a lawyer-client relationship and whether the putative client could assert the lawyer-client privilege under OEC 503 as to communications with the lawyer. *Id.* at 84.

We now turn to the evidence in the record to determine whether Richard ever was a "client" of the accused for purposes of DR 5-105(C). As described above, Richard consulted the accused for approximately two hours concerning representation in his divorce. The accused provided Richard substantive advice on various aspects of the divorce proceeding. Richard reasonably believed that the consultation was confidential, and the accused also believed that it was confidential. Richard expected to be billed for his consultation with the accused, and the accused in fact sent him a bill.

Richard also discussed with the accused the factual details regarding the restraining orders. The accused provided Richard with legal advice concerning the evidence a court would require from Richard before he could obtain such an order. The accused never told Richard that he was not the accused's client, that Richard should avoid disclosing confidential information, or that the creation of a lawyer-client relationship would be deferred until some later date.

Although Richard ultimately decided not to retain the accused to appear on his behalf in the divorce proceeding (or in connection with the restraining orders), we conclude that the Bar has proved by clear and convincing evidence that Richard was a client of the accused for purposes of DR 5-105, at least during their consultation on October 4, 2000. The accused identifies certain evidence that, he asserts, supports his view that Richard was only a *prospective* client, including correspondence from Urrutia and Laney to the accused that refers to the accused's "potential representation" of Richard. The accused is correct that *some* evidence in the record supports his claim that Richard was a prospective client; however, as we have determined, clear and convincing evidence in the record supports our conclusion that Richard was a client. The accused also correctly points out that

Richard never affirmatively retained the accused to represent him as trial counsel in the divorce proceeding. The lawyer-client relationship, however, is not as narrow as the accused suggests, and a lawyer-client relationship may be—and often is—limited to office consultations in which a client seeks, and the lawyer gives, legal advice. The conflicts rules protect clients who seek and obtain such advice as much as they do clients who retain lawyers to represent them in court proceedings. Because Richard was the accused's client for a time, when Richard decided to retain another lawyer instead of the accused, and so informed the accused, Richard became a "former client" of the accused for purposes of DR 5-101(C).[7]

DR 5-105(C) prohibits a lawyer who has represented a client in a matter from representing a subsequent client in the same matter, when the two clients' interests are in actual or likely conflict. An "actual conflict" exists when "the lawyer has a duty to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client." DR 5-105(A)(1).

The accused represented Richard in connection with the divorce proceeding. He subsequently represented Linda in the same proceeding. By representing Linda, the accused assumed a duty to advocate for her financial interests in the distribution of the marital estate—a duty diametrically opposed to his obligations when he had advised Richard in connection with the divorce. We conclude that the Bar has proved by clear and convincing evidence that the accused had an actual conflict of interest in representing Linda in the divorce.

The accused contends that he actually did not represent Linda in the divorce because he undertook no actions on her behalf. We reject that argument because we find, as a factual matter, that the accused did take such actions, including but not limited to several meetings in which he advised Linda on the appropriate legal strategy in the divorce.

---

[7] We do not need to decide, for purposes of this case, the date that Richard became a "former client" of the accused. Certainly, he had become a former client before November 30, the date that the accused met with Linda.

354

■ The Bar also contends that the accused violated DR 5-105(C) by representing Linda in the proceeding concerning the November 2000 restraining order that Richard had obtained against her. According to the Bar, that violation occurred because the order was "significantly related" to the divorce.

DR 5-105(C) prohibits a lawyer who has represented a client from representing a subsequent client on a "significantly related matter" when the two clients' interests are in actual or likely conflict. That rule provides that a subsequent matter is "significantly related" to an earlier matter when, in part, the representation of the former client provided the lawyer with "confidences" or "secrets," as defined in DR 4-101(A), the use of which would, or likely would, inflict injury or damage upon the former client in the course of the subsequent matter.[8]

The accused received confidences and secrets from Richard. As described above, Richard shared his version of the facts underlying the restraining order that Linda obtained against him. He also discussed additional incidents in which he believed Linda had threatened him and possible grounds for obtaining a restraining order against her. Richard later based his petition for a restraining order against Linda on some of the same facts. Richard also discussed with the accused Linda's motivation for obtaining her restraining order against him and his motivation for obtaining a restraining order against her. Those views likely would have been important to Richard's prosecution of his petition for a restraining order and his responses to Linda's defense. As previously noted, both Richard and the accused believed that the consultation was confidential, and the accused understood that his conversation with Richard was covered by the lawyer-client privilege.

---

[8] DR 4-101(A) provides:

" 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in a current or former professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

The Bar does not claim that the accused used the confidences communicated to him by Richard in his representation of Linda. However, DR 5-105(C)(2) requires only that the accused could have used them in a way that would have been likely to harm Richard, and we find that requirement met here.

We conclude that the accused's representation of Linda in connection with the restraining order that Richard sought against her was significantly related to his earlier representation of Richard. The interests of Richard and Linda were in actual conflict in that matter because Richard sought to obtain and sustain a restraining order that Linda sought to overturn. The accused therefore violated DR 5-101(C) by representing Linda in the restraining order matter.

The accused argues that he should not be deemed to have violated DR 5-105(C) because he had ended the representation as soon as possible after he had discovered the conflict and consulted with ethics counsel. He contends that finding a violation here is inappropriate because it would discourage lawyers from consulting ethics counsel in the future.

We disagree. The accused should have known of the conflict before he began representing Linda; he did not because he had no real procedure for checking for conflicts. The accused did not conduct routine "conflicts checks" to determine whether the representation of a potential new client might present a conflict. He kept a client address list, to which he added the names of potential clients if he thought that they might become clients. That file contained Richard's name. Indeed, the accused not only placed Richard's name on that list, but also opened a file, which included documents, correspondence, and the bill that he sent Richard. However, the accused checked his list or other files only when his memory alerted him to a potential problem. According to his testimony, he did not check his client list when Linda consulted him or before agreeing to represent her. Clearly, he should have.

In our view, a lawyer in the accused's situation may not rely solely on his or her memory to avoid prohibited conflicts of interest. If the accused had established and used a more reliable procedure, then he would have known of his prior consultation with Richard and would have been able to consult with ethics counsel before he met with Linda. The accused emphasizes the benefits to the public and to the bar if lawyers consult with ethics counsel when faced with a possible conflict, and we encourage that sort of consultation. However, in contrast to complex transactions or cases involving numerous parties and close questions of whether parties' interests may be adverse, this was a straightforward, if contentious, divorce proceeding (with related restraining order disputes) between two people who had the same last name. We agree with the trial panel that the conflict here should have been obvious to the accused and should have caused the accused to decline to represent Linda when he first met with her.

## SANCTION

In determining an appropriate sanction, this court refers to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards). *Spencer*, 335 Or at 85-86. The ABA Standards provide that, when imposing sanctions, the court should consider the following factors: "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." ABA Standard 3.0.

The accused's conduct violated two ethical obligations. A lawyer violates a duty to the legal system by speaking to a represented party, contrary to the prohibition of DR 7-104(A)(1). ABA Standard 6.3. A lawyer's most important ethical duties are those owed to clients, including the duty to avoid conflicts of interest that violate DR 5-105(C). ABA Standards at 8.

The ABA Standards recognize three culpable mental states: intent, knowledge, and negligence. ABA Standards at 12. Intent is "the conscious objective or purpose to accomplish

a particular result." *Id.* Knowledge is "the conscious aware-ness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* Negligence is "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the stan-dard of care that a reasonable lawyer would exercise in the situation." *Id.*

As to the accused's violations of DR 7-104(A)(1), we conclude that the accused's state of mind was intentional. He knew that Clark and Maddocks were represented parties, and he continued to speak with them about the subject of the representation, even after they informed him that he should speak with their counsel. We reject the accused's defense that he intended only to determine whether he could continue to work with his employees, because the content of the conver-sations related not only to whether he could work with Maddocks and Clark, but also to their action against him and their reasons for bringing it.

The accused's violation of DR 5-105(C) was knowing. Even if we accept the accused's assertion that he was una-ware of his conflict of interest until Richard's lawyer, Urrutia, informed him that he previously had represented Richard and therefore had a conflict, the accused continued to represent Linda on both matters after being so informed. That representation was not intentional, because we do not find that the accused intended to use that conflict to his advantage. However, we conclude that it was knowing because the accused persisted in the representation despite knowing facts that should have led him to conclude that he had a conflict.

The ABA Standards require consideration of both injury and potential injury that results from a lawyer's vio-lation of the disciplinary rules. Injury is any actual harm, from "serious" injury to "little or no" injury. ABA Standards at 12. Potential injury is harm that was reasonably forsee-able at the time of the violation and that did not occur, but that would have occurred absent some intervening factor. *Id.* Both injury and potential injury are measured by their

impact on "a client, the public, the legal system or the profession." *Id.*

The accused's violations of DR 7-104(A)(1) caused potential injury. Although the accused's communications with Clark and Maddocks injured neither employee, it was reasonably foreseeable that one or both employees would reveal privileged information in response to his inquiries or would be so intimidated by the threatening behavior of their employer that they would cease or limit their participation in the action because they feared adverse consequences for their jobs.

The accused's violation of DR 5-105(C) caused actual injury, because both Linda and Richard were billed for time spent by their lawyers in resolving the conflict. It also caused actual injury to Linda by complicating and delaying her effort to change counsel at a critical time in her case. Because of the time spent resolving the conflict, Linda, who previously had decided to change counsel by hiring the accused, had to return to her earlier lawyer because she was the only available lawyer familiar with the circumstances of Linda's case when the hearings arose. The accused's conduct also caused potential injury to Richard because of the risk that the accused would use confidential information obtained from Richard against him.

We find the following aggravating factors relevant in determining the appropriate sanction. The accused, who was admitted to the Oregon State Bar in 1973, has substantial experience in the practice of law. ABA Standard 9.22(i). He has several prior disciplinary violations, which we discuss below. The victims in the DR 7-104(A)(1) violations—Clark and Maddocks—were vulnerable because they were the accused's employees. ABA Standard 9.22(h). In committing the DR 7-104(A)(1) violations, the accused had a selfish motive and committed multiple offenses, and in the DR 5-105(C) violation, the accused also had a selfish motive. ABA Standards 9.22(b), (d).

As to mitigating factors, the accused asserts, and the Bar agrees, that the accused has demonstrated a cooperative attitude in these disciplinary proceedings. The accused argues that two other mitigating factors are present here.

First, as discussed above, the accused argues that his DR 7-104(A)(1) violations were brief, were justified by his understandable emotional reaction to being sued by his employees, and occurred in connection with his effort to determine whether he could continue to work with Maddocks and Clark. We do not accept the accused's characterization of his purpose in communicating with Maddocks and Clark, but it is true that the communications were brief and transitory. For that reason, the accused argues that reprimand is the appropriate sanction. We discuss that argument below. At this point, we simply note that nothing in the disciplinary rules or in the ABA Standards supports the accused's contention regarding these proposed mitigating factors. On the contrary, as discussed previously, the potential injury that the rule is intended to prevent is present even when the prohibited communication results from a lawyer's understandable emotional reaction and even if the communication is brief and transitory.

Second, the accused argues that his quick withdrawal as Linda's lawyer after learning of the conflict involving Richard is a mitigating factor in connection with the sanction for the DR 5-105(C) violation. We already have rejected that argument as a defense to the Bar's charge, and we now reject it as a mitigating factor. The accused knew or should have known that he previously had represented Richard, and therefore had a conflict of interest, when he first met with Linda. He had actual knowledge of the fact of his prior representation and therefore of the conflict within a few days. The accused did not act with alacrity.

Based on the discussion above, we now consider the preliminary sanction for the accused's violations. Suspension is generally appropriate when a lawyer communicates with an individual regarding a legal matter when the lawyer knows that the person is represented, and the communication causes injury or potential injury. ABA Standard 6.32. Reprimand is generally appropriate when a lawyer negligently accepts a representation that creates a conflict of interest, ABA Standard 4.33, but suspension is generally appropriate when a lawyer does so knowingly. ABA Standard 4.32. As previously discussed, the accused argues that the nature of his DR 7-104(A)(1) violations justifies a reprimand,

rather than a suspension. If the accused had not previously been sanctioned for violating DR 7-104, and if he had not also violated DR 5-105, we might agree with the accused that a reprimand is the appropriate sanction. *See Lewelling*, 296 Or at 706-07 (noting three prior cases imposing reprimands for lawyers who communicated with represented persons, but there imposing suspension because of dishonesty, breach of trust, and additional violation). As we discuss below, however, that is not the case here. We find that a suspension from the practice of law is the appropriate preliminary sanction for the accused's two violations.

■■ We now consider the appropriateness of that preliminary sanction in light of Oregon case law and, in particular, in light of this court's cases concerning the aggravating factor we have not yet developed, *viz.*, the accused's prior disciplinary violations. When evaluating "prior offenses" to determine a sanction for lawyer misconduct, this court reviews all "offenses that have been adjudicated prior to imposition of the sanction in the current case." *In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997). However, in determining the weight of each offense, we consider five factors:

> "(1) the relative seriousness of the prior offense and resulting sanction; (2) the similarity of the prior offense to the offense in the case at bar; (3) the number of prior offenses; (4) the relative recency of the prior offense; and (5) the timing of the current offense in relation to the prior offense and resulting sanction, specifically, whether the accused lawyer had been sanctioned for the prior offense before engaging in the offense in the case at bar."

*Id.*

The accused has four prior offenses. He received a letter of admonition for violating DR 7-104(A)(1) in February 1995. He was reprimanded for violating that rule in September 2000. In May 2004, this court suspended the accused for 90 days for two additional offenses: one violation of DR 5-107(A) (self-interested conflict of interest) and one violation of DR 6-101(B) (neglecting legal matter). *In re Knappenberger*, 337 Or 15, 90 P3d 614 (2004).

As to the temporal relation between those prior offenses and the violations that we have found here, we note

that in March 2000, when the accused committed the DR 7-104(A)(1) violations at issue here, the Bar already had admonished him for one violation of that rule and was prosecuting him for a second violation. In November 2000, when the accused violated DR 5-105(C), the trial panel in his earlier case had found that he had committed the second DR 7-104(A)(1) violation. Since then, he has been sanctioned for violating two other rules. We note that the accused's first prior offense is 10 years old and that his two most recent offenses occurred after the violations we consider today. However, all his prior offenses taken together present an unsettling record of violating the disciplinary rules. In particular, they show that he has a history of improper communications with represented parties.

As we previously noted, this court has reprimanded some lawyers for violations of DR 7-104(A)(1) but has suspended other lawyers who violated that rule along with another rule. *See Lewelling*, 296 Or at 706-07 (60-day suspension for communication with represented party and other violation). This court ordinarily suspends lawyers who violate DR 5-105(C). *In re Hockett*, 303 Or 150, 163-64, 734 P2d 877 (1987) (30-day suspension appropriate for single violation of DR 5-105(C)); *In re Wyllie*, 331 Or 606, 625 (2001) (90-day suspension for violation of DR 5-105(C) and for other violations that were the product of the lawyer's "sloppy and careless office practices, not [his] intentional or knowing misconduct").

The principal difference between this case and those is the extent of the accused's record of prior sanctions, many of which involve the same kind of violations as are involved here. We conclude that, in order to get the accused's attention—and thereby protect the public—the accused should receive a significant period of suspension. On the violations that the trial panel found, we might agree with the trial panel's determination that a 90-day suspension was appropriate. The trial panel, however, essentially disregarded the accused's prohibited communication with Maddocks. As we have explained elsewhere, we view the accused's actions in that instance more seriously. We conclude that the appropriate sanction is a 120-day suspension.

The accused is suspended from the practice of law for 120 days, commencing 60 days from the date of filing of this decision.