Argued and submitted November 2, 2006, accused suspended from practice of law for 90 days, commencing 60 days from date of decision January 19, 2007

In re Complaint as to the Conduct of

# MICHAEL G. BALOCCA,
*Accused.*

(OSB 05-02; SC S53380)

151 P3d 154

Michael G. Balocca, Ashland, argued the cause and filed the brief for himself.

Jane Angus, Assistant Disciplinary Counsel, Lake Oswego,argued the cause and filed the brief for the OregonState Bar. With her on the brief was Charles M. McNair, Bar counsel.

Before De Muniz, Chief Justice, and Carson,* Gillette, Durham, Balmer, Kistler, and Walters, Justices.

PER CURIAM

---

* Carson, J., retired December 31, 2006, and did not participate in the decision of this case. Linder, J., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (the Bar) charged Michael G. Balocca (the accused) with violating five Disciplinary Rules (DR) of the Oregon Code of Professional Responsibility[1] in his representation of Marc Taylor and, subsequently, Carol Brookins. The Bar alleged that the accused violated DR 9-101(A) (requiring lawyer to deposit and maintain client funds in trust), DR 9-101(C)(3) (requiring lawyer to account for client funds), DR 2-106(A) (prohibiting illegal or clearly excessive fee), DR 2-110(A)(3) (requiring lawyer promptly to deliver unearned fee on termination of employment), and DR 5-105(C) (prohibiting representation that would conflict with representation of former client).

Three factual disputes underlie the charges: (1) whether Taylor signed a written fee agreement that specified that the fees that he paid to the accused were deemed earned upon receipt; (2) whether the $300 that the accused collected from Taylor was an excessive fee for the work that he performed for Taylor; and (3) whether the accused obtained confidences or secrets from Taylor such that the accused's subsequent representation of Brookins in a paternity petition that Taylor filed against Brookins created a conflict of interest.

After a two-day hearing, a trial panel of the Disciplinary Board found by clear and convincing evidence that Taylor had not signed a written fee agreement providing that the fees that he had paid to the accused were deemed earned upon receipt, that the accused had not earned the $300 paid by Taylor, and that the accused had obtained confidences or secrets from Taylor that created a conflict for the accused in his subsequent representation of Brookins. The trial panel concluded that the accused had violated all the rules charged in the Bar's complaint and suspended the accused from the practice of law for 120 days.

---

[1] The Code of Professional Responsibility applies to the conduct at issue in this case. The conduct occurred prior to the effective date of the new Oregon Rules of Professional Conduct. The new rules were not effective until January 1, 2005, pursuant to this court's order dated December 1, 2004.

■        Pursuant to ORS 9.536(1) and Bar Rules of Procedure (BR) 10.1 and 10.3, the accused seeks review of the trial panel's decision. We review a decision of the trial panel *de novo*. ORS 9.536(2); BR 10.6. The Bar must establish misconduct by clear and convincing evidence, which "means evidence establishing that the truth of the facts asserted is highly probable." *In re Cohen*, 316 Or 657, 659, 853 P2d 286 (1993). For the reasons that follow, we conclude that the accused committed the violations charged and suspend the accused from the practice of law for 90 days.

## I.  FACTS

The accused was admitted to practice law in Oregon in 1983 and in New Hampshire in 1984. He practiced law in New Hampshire from 1984 to 1988 and has practiced law in Oregon since 1988.

### A.  *Taylor Matter*

Brookins, whom the accused previously had advised on a bankruptcy petition, referred Taylor to the accused for a bankruptcy consultation. Taylor and Brookins had a romantic relationship at that time. Taylor consulted with the accused on July 11, 2002, about filing for bankruptcy. Prior to meeting with the accused, Taylor had completed the accused's client intake form, including providing information regarding his finances. At the meeting, the accused and Taylor reviewed the information on the intake form and discussed other aspects of Taylor's financial status, as well as some of the details of the accused's proposed representation of Taylor. The accused agreed to represent Taylor and to prepare and file a bankruptcy petition for a flat, nonrefundable fee of $550, plus costs and expenses of $225.

The accused asserts that, at their initial meeting, he also explained to Taylor that the $550 flat fee was deemed earned upon receipt, that the accused would not begin work until Taylor had paid at least $100, that Taylor could pay in installments, and that the accused would not file the bankruptcy petition until Taylor had paid the entire $775 of the fees and costs. The accused testified that his office had provided to Taylor, and that Taylor had signed, the standard fee

agreement form that he used with most of his bankruptcy clients and that the form explicitly stated that all fees paid under the agreement were deemed earned upon receipt.[2]

Taylor testified that the accused had not explained that the fees were deemed earned upon receipt and that he never had signed a fee agreement. Although Taylor initially told the Bar that he had signed a fee agreement, he subsequently testified that he was mistaken and that the document that he had recalled signing was a different document. The accused, although admitting that he never saw an agreement with Taylor's signature, maintains that such an agreement must have been signed by Taylor but subsequently lost by the accused's office. The accused was unable to produce a fee agreement signed by Taylor, but he did introduce at the hearing the form of agreement that he claims that Taylor had signed.

Taylor testified that, after his initial consultation with the accused, the accused's secretary, Curtis,[3] gave him an 11-page form with detailed questions concerning his finances. Taylor stated that he answered the questions and returned the form to the accused's office on August 6, 2002. The accused maintains that Taylor never returned it. Neither party has been able to produce a copy or the original of Taylor's completed financial questionnaire.

Taylor paid $100 to the accused on July 11, 2002, and he made additional $100 payments on August 6, 2002, and October 16, 2002. Taylor did not pay the balance of the fee or the costs. The accused admits that he did not deposit the $300 into his lawyer trust account and that he never provided an accounting of the money to Taylor. The accused argues that, because his flat-fee agreement stated that the fees were deemed earned upon receipt, the money was no longer Taylor's but was his and, therefore, the Disciplinary

---

[2] As described in greater detail below, the accused's testimony was inconsistent, in some respects, with his initial responses to the Bar's letter of inquiry, in which he had stated that, although he had met with Taylor for 15 minutes in July 2002, he "did not represent Mr. Taylor." The accused also had informed the Bar in a September 9, 2004, letter that "Mr. Taylor never returned a signed retainer agreement to my office."

[3] Curtis, the accused's secretary at that time, did not testify before the trial panel.

Rules forbade him from placing that money into his lawyer trust account.

On July 22, 2002, the accused paid $100 to Karon Aaker (Aaker), an independent contract paralegal, to prepare bankruptcy schedules for Taylor to be filed with a bankruptcy petition. The accused regularly hired Aaker to prepare bankruptcy petitions and schedules for his clients, and he paid her a nonrefundable $100 fee for such services for each client. Aaker, however, never received any documents regarding the Taylor matter, either from the accused or from Taylor, and she never prepared any petition or schedules for Taylor's bankruptcy. In August 2002, the accused asked Aaker about the status of Taylor's bankruptcy schedules. Aaker responded in a memorandum to the accused, stating that she had not received any documents concerning Taylor and therefore was unable to produce the bankruptcy schedules. She also told the accused that his secretary frequently did not provide Aaker with the information necessary to complete the schedules that the accused paid her to prepare. The accused apparently took no action in response to that memorandum, but he did fire his secretary later that year.

After the July 11, 2002, bankruptcy consultation, the accused and Taylor never met again to discuss the bankruptcy. Testimony at the trial panel hearing indicated that the accused, through his secretary, may have provided advice to Taylor on one additional occasion after the initial consultation. It is undisputed that neither the accused nor Aaker ever prepared a bankruptcy petition or schedule for Taylor and that, beyond the accused's claim that he had made himself available to respond to Taylor's creditors, thus precluding himself from representing any of them against Taylor, the accused did nothing further of any substance on the matter after paying Aaker the $100 in July 2002 and inquiring in August 2002 whether she had completed the forms.

The accused testified that he "closed" the file on his representation of Taylor's bankruptcy petition during the summer or fall of 2003, and the Bar does not dispute that. The accused did not inform Taylor that he had closed the file or refund any of the $300 that Taylor had paid to him. The accused testified that he did not refund any of the fee because

he believed that he had earned that portion of the fee. The accused later refunded $300 to Taylor in September 2004, after the Bar had begun its investigation of the accused's conduct and had informed the accused that, under the Disciplinary Rules, he might be required to refund the money to Taylor. The accused continues to argue that he earned the $300.

B. *Brookins Matter*

In early 2003, Brookins informed Taylor that she was pregnant with his child, and she gave birth to a daughter in September 2003. Soon thereafter, Brookins contacted the accused and requested that he represent her in a paternity action involving Taylor. Brookins apparently was concerned that Taylor would demand custody or visitation rights beyond what she thought was appropriate.

The accused did not agree immediately to represent Brookins on that matter and informed her, through his secretary, that he might have a conflict of interest due to his prior representation of Taylor. The accused reviewed his files on Taylor's bankruptcy petition and determined that he did not have a conflict. He wrote a memorandum to the file stating:

> "No info[rmation] or confid[ence]s from Taylor re Brookins' affair or their pregnancy/child [*sic*]. Conclusion - Brookins was cl[ient] previously. I can cont[inue] to adv[ise] her, as long as [I] don't use any info[rmation]/knowledge about Taylor I gained from him."

The accused asserts that "he never received any detailed information from Taylor other than the intake form * * * [and] also believe[s] that Taylor had already shared this minimal, non-specific information with Brookins[.]"

The accused began to represent Brookins in early January 2004. The accused did not seek written consent to the representation from Taylor or Brookins. Taylor, represented by Bryan Blodgett, filed a paternity petition against Brookins that sought to establish custody, visitation rights, and child support. The accused filed an answer on behalf of Brookins. Taylor's petition and Brookins's answer both stated that Taylor was the father of Brookins's child. Taylor,

however, sought confirmation that the child was his and filed a motion requesting DNA testing of the child. The court denied the motion, and the accused sought and obtained an attorney fee award against Taylor for the accused's fees incurred in responding to that motion.

After the court denied the motion for DNA testing, Taylor informed Blodgett that the accused had represented him in the bankruptcy matter. Blodgett then sent a letter to the accused stating that Taylor believed that the accused had a conflict of interest due to the accused's former representation of Taylor and that Taylor did not want to pay the attorney fee award. Blodgett also noted that the accused had not refunded the $300 that Taylor already had paid to him, even though the accused had failed to perform any services for Taylor. The next day, the accused informed Blodgett that he needed to review his files on the Taylor bankruptcy petition. The accused subsequently responded with a letter to Blodgett dated July 2, 2004, in which he stated that there had been "no attorney-client relationship" and that the money that Taylor had paid to the accused was "earned when received and [was] not refundable." Brookins and Taylor settled the paternity action in December 2004.

## II. ALLEGED VIOLATIONS

### A. *Taylor Matter*

#### 1. *DR 9-101(A) and DR 9-101(C)(3)*

■ The Bar argues that the accused violated DR 9-101(A) and DR 9-101(C)(3) because he did not deposit the $300 from Taylor into his lawyer trust account and because he never provided an accounting of that money to Taylor. We begin by examining the rules and the types of lawyer-client billing arrangements to which they apply. DR 9-101(A) provides, in part:

> "All funds of clients paid to a lawyer or law firm, including advances for costs and expenses and escrow and other funds held by a lawyer or law firm for another in the course of work as lawyers, shall be deposited and maintained in one or more identifiable trust accounts in the state in which the law office is situated."

DR 9-101(C)(3) provides, in part, that a lawyer shall

> "[m]aintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the lawyer's client regarding them."

Under those rules, a lawyer is required to deposit all client funds into a lawyer trust account and to provide statements to the client accounting for that money. The lawyer may withdraw fees from that account only after those fees have been earned. Those rules describe the common arrangement in which the client pays a "retainer" amount that is held in trust, with the lawyer then performing work on an hourly or other agreed-upon basis and reducing the retainer amount, usually on a monthly basis, as the lawyer performs the work. The critical aspect of such an arrangement is that the retainer payment is the *client's* money until the lawyer performs legal services that the client has agreed to pay for. A retainer arrangement contrasts with another common billing practice in which the lawyer performs work for the client and *then* bills the client for the work performed. When the client pays a lawyer's bill for work already performed, that payment is the *lawyer's* money, not "client funds" as that term is used in DR 9-101(A) and DR 9-101(C)(3), and the lawyer is not required to deposit the funds into a trust account or to account to the client for the funds.

In *In re Hedges*, 313 Or 618, 836 P2d 119 (1992), this court discussed a variation of the standard retainer arrangement described above, stating that a lawyer may be excused from depositing into a trust account money received from a client before services are performed *if* the client has agreed, in writing, that all legal fees paid are deemed earned by the lawyer upon receipt. *Id.* at 623-24. In that situation, the money does not qualify as "client funds" under DR 9-101(A) and DR 9-101(C)(3), because the parties have agreed that, at the time that it is paid, it is the lawyer's money. In *Hedges,* however, the accused lawyer lacked a written agreement explicitly providing that fees were deemed earned upon receipt, and this court concluded that the lawyer had violated the predecessor to DR 9-101(C)(3) by treating the money as

his own when, instead, the money was the property of the client until earned by the lawyer. 313 Or at 623-24. This court further explained the requirement of a written agreement in *In re Biggs*, 318 Or 281, 293, 864 P2d 1310 (1994): "Without a clear written agreement * * * that fees paid in advance constitute a non-refundable retainer earned upon receipt, such funds must be considered client property and are, therefore, afforded the protections imposed by DR 9-101(A)."

Here, it is undisputed that the accused did not deposit the $300 that he received from Taylor into his lawyer trust account and did not provide any accounting of those funds to Taylor. It also is undisputed that the $300 was not payment for services already performed and billed by the accused. For that reason, whether the accused violated DR 9-101(A) and DR 9-101(C)(3) turns on whether, at the time that the payments were made, Taylor had signed an agreement providing that the fees that he paid were nonrefundable and were deemed earned by the accused upon receipt.

The Bar has the burden to prove by clear and convincing evidence that the accused engaged in conduct that violated the Disciplinary Rules. The accused argues that clear and convincing evidence does not support the Bar's claim that he did *not* have a nonrefundable fee agreement with Taylor. In contrast to *Hedges* and *Biggs*, where the accused lawyers each admitted that they had no written fee agreements with their respective clients, the accused here claims that there *was* such an agreement; he simply is unable to produce it. Nevertheless, he asserts, the Bar's burden of proving that he violated DR 9-101(A) and DR 9-101(C)(3) requires that the Bar prove that no such agreement existed.

We disagree. In our view, the text of the relevant rules, quoted above, as well as this court's cases interpreting those rules, make it clear that client funds must be deposited into a lawyer trust account *unless* a written agreement provides that the funds are nonrefundable and are deemed earned upon receipt. The accused testified that the three $100 payments that Taylor had made were installments on a $550 flat-fee amount and were not payments for services

already rendered and billed. DR 9-101(A) provides, in part, "All funds of clients paid to a lawyer * * * shall be deposited [into a trust account]." As this court stated in *Biggs*, "Without a clear written agreement [that a payment constituted a non-refundable retainer earned on receipt], *such funds must be considered client property* * * *." 318 Or at 293 (emphasis added). It follows that Taylor's payments "must be considered [Taylor's] property"—and the accused therefore was required to deposit them in a trust account—*unless* the accused had a written agreement with Taylor.

For those reasons, although the Bar has the burden of proving the alleged violations by clear and convincing evidence, it does not have the burden of proving the nonexistence of the fee agreement. Rather, because the accused sought to rely on the existence of the fee agreement to justify his handling of Taylor's payments, it is his burden to demonstrate the existence of such an agreement. We turn to that factual dispute.

We initially note, again, that neither party produced the original or a copy of a signed fee agreement at the trial panel hearing. Although that fact obviously makes it more difficult for the accused to show that such an agreement existed, it could have been proved by testimony or other evidence. There is, however, little credible evidence to support the accused's claim in that regard. Neither the accused, nor any other witness, saw Taylor sign a fee agreement or saw an original or copy of a signed fee agreement. The evidence supporting the accused's contention consisted of (1) his testimony that his usual practice was to require his bankruptcy clients to sign such a fee agreement and that he thought that that practice had been followed with respect to Taylor; and (2) an e-mail that Taylor had sent to the Bar in which he stated that he had signed a fee agreement. At the hearing, Taylor testified that he had been mistaken in his e-mail to the Bar and that the document that he recalled signing was a one-page document (rather than accused's three-page standard form fee agreement).

The Bar asserts that the evidence supports its contention that the accused had no written fee agreement with

Taylor. In addition to the fact that no agreement was produced, the Bar points to Taylor's testimony that he never had signed a fee agreement; the accused's letter to Blodgett stating he never had represented Taylor; an August 6, 2004, letter from the accused to the Bar again stating that he never had represented Taylor; and a September 9, 2004, letter from the accused to the Bar stating that "Mr. Taylor never returned a signed retainer agreement to my office."

The trial panel specifically found that the accused's testimony of this issue lacked credibility. The trial panel noted the accused's conflicting statements regarding the fee agreement and also his demeanor at the hearing. The trial panel observed the accused's testimony and stated that it believed that he was trying to "confuse and hide the facts." In contrast, the trial panel accepted Taylor's explanation, based on his description of the document that he did sign, that his earlier e-mail to the Bar had been mistaken (that is, that the document that he had signed was not a fee agreement). The trial panel found that the Bar had proved, by clear and convincing evidence, that there was no written fee agreement between the accused and Taylor.

As noted previously, the Bar did not bear the burden of proving by clear and convincing evidence that no written fee agreement existed. Rather, the accused bore the burden of proving that he did have a written agreement with Taylor that allowed the accused to deposit Taylor's payments into the accused's own account. Having reviewed the record *de novo*, we conclude that the accused has not carried his burden of proving that he had a written fee agreement with Taylor.

For the reasons set out above, we conclude that the accused violated DR 9-101(A) by failing to deposit Taylor's funds into his lawyer trust account. Because we have concluded that the $300 paid by Taylor constituted "client funds," and because the accused admits that he did not render any account of those funds to Taylor, we also conclude that the accused violated DR 9-101(C)(3).

## 2. *DR 2-106(A) and DR 2-110(A)(3)*

The Bar argues that the accused collected an excessive fee in violation of DR 2-106(A).[4] The Bar first points out that, although the accused agreed, for a flat fee, to handle Taylor's entire bankruptcy proceeding and to deal with Taylor's creditors, he never even prepared or filed a bankruptcy petition and met only once with Taylor. The Bar argues that the accused cannot use an hourly basis to justify his fee, because that would deprive Taylor of the benefit of the flat-fee agreement; rather, in the Bar's view, whether the accused's fee was excessive must be determined based on the extent to which the accused performed the agreed-upon services. Because the accused took no substantial steps to complete the agreed-upon work of representing Taylor in filing and completing the bankruptcy proceeding, the Bar argues, the $300 that the accused collected—more than half of the amount for which the accused had agreed to perform all of the services—was clearly excessive.

The Bar notes that this court has held that a lawyer violates DR 2-106(A) "when he or she collects a nonrefundable fee, does not perform or complete the professional representation for which the fee was paid, but fails promptly to remit the unearned portion of the fee." *In re Gastineau*, 317 Or 545, 551, 857 P2d 136 (1993). The Bar also argues that, even if the accused were justified in charging Taylor at an hourly rate for the time that he spent working on Taylor's matter, $300 was a clearly excessive amount, given the limited work that the accused actually performed.

The accused responds that he did not file a bankruptcy petition or complete other work for Taylor because Taylor failed to provide needed financial information, failed to participate in a scheduled telephone conference with the accused, and lost contact with the accused. He points out that Taylor moved twice during the course of the representation, that the accused made efforts to contact Taylor, and that the

---

[4] DR 2-106(A) provides:

"A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee."

accused later learned that Taylor had decided not to proceed with filing a bankruptcy petition. In those circumstances, the accused argues, the value of his services that he provided to Taylor was at least $300.

The accused's argument is misplaced. Contrary to the accused's characterization of the agreement with Taylor, Taylor did not retain the accused primarily to advise him regarding his financial problems or to represent him in dealings with creditors. Although the accused asserts that he stood prepared to offer those services, there is clear and convincing evidence that the agreement required the accused, in return for a nonrefundable flat fee, to handle Taylor's bankruptcy case. Even Taylor's initial consultation with the accused, which the accused now characterizes as a meeting where he offered extensive substantive advice to Taylor and for which he was justified in charging Taylor a fee, is more accurately viewed as a consultation intended to help Taylor determine whether it would be advantageous for him to file for bankruptcy. Only at the conclusion of that meeting did Taylor make that decision and agree that the accused would undertake the bankruptcy representation for a flat fee. Computing the amount that the accused earned based on hours expended would, as the Bar notes, deny Taylor the benefit of the flat-fee arrangement. *See In re Yacob*, 318 Or 10, 18, 860 P2d 811 (1993) (finding violation of DR 2-106(A) when lawyer collected more than flat-fee agreement allowed where lawyer had determined that his firm had earned substantially more than fee agreement amount of $150).

In this case, the accused agreed to prepare, file, and complete Taylor's bankruptcy proceeding for a flat fee. He did no substantial work on that matter. We find that the accused did not earn the $300 that he collected and that that fee, therefore, was excessive and a violation of DR 2-106(A).

The Bar asserts that the accused also violated DR 2-110(A)(3), which requires that a "lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned." The accused admits that he did not refund the fees when he closed the file in 2003, and, as discussed above, we find that he did possess client funds that he promptly should have refunded. However, the

violation of DR 2-110(A)(3) is based on the same conduct as the violation of DR 2-106(A) and, on the facts of this case, followed ineluctably from it. We therefore do not treat the two offenses as justifying a greater sanction due solely to the fact that the Bar charged and proved a violation of DR 2-110(A)(3) as well as a violation of DR 2-106(A).

## B. *Brookins Matter*

■ The Bar alleged that the accused violated DR 5-105(C) when he represented Brookins in the paternity action without obtaining the consent of Brookins or Taylor because he possessed secrets or confidences from his prior representation of Taylor—specifically, information about Taylor's finances—the use of which likely would cause injury to Taylor.[5]

DR 5-105(C) provides, in part:

"Except as permitted by DR 5-105(D) [regarding obtaining consent to such representation], a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict. Matters are significantly related if * * *

"* * * * *

"(2) Representation of the former client provided the lawyer with confidences or secrets as defined in DR 4-101(A), the use of which would, or would likely, inflict injury or damage upon the former client in the course of the subsequent matter."

The terms "confidence" and "secret" are defined in DR 4-101(A):

" 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in a current or former professional relationship that the client has requested be held

---

[5] DR 5-105(D) provides that a "lawyer may represent a client in circumstances otherwise prohibited by DR 5-105(C) when both the current client and the former client consent to the representation after full disclosure." Here, as noted, the accused did not obtain consent from Brookins (the current client) or from Taylor (the former client).

inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

We first determine whether the accused obtained confidences or secrets from Taylor. The Bar alleges that the accused obtained secrets or confidences from Taylor from three sources: the initial intake form that Taylor completed on July 11, 2002; the conversation between the accused and Taylor on that day; and the detailed 11-page questionnaire that Taylor claims to have completed and returned to the accused's office. The accused argues that he did not violate DR 5-105(C) because he received only the initial intake form, not the detailed questionnaire, and because Taylor already had shared with Brookins all the information that Taylor had provided to the accused. The accused also asserts that the information that Taylor had provided to him was neither confidential nor secret because that same information would have been revealed in a Uniform Child Support Affidavit, a form that Taylor would have been required to complete if the paternity action had proceeded further. Finally, the accused asserts that the financial information that Taylor had provided to him could not have amounted to a secret or confidence likely to harm Taylor because the information was two years old, the paternity suit concerned custody, not financial support, and because any information about Taylor's poor finances would only help Taylor, not hurt him, in establishing child support.

We need not decide whether Taylor completed, and the accused received, the 11-page financial information form, because we conclude that the information that Taylor provided on the four-page client intake form constituted "secrets" as that term is used in DR 5-105(C)(2). The intake form, which the accused admits Taylor completed and gave to him, included Taylor's monthly income, debts, assets, and pending lawsuits. Taylor provided that information to the accused in the course of his representation of Taylor, and the disclosure of that information would have been embarrassing to Taylor and "would be likely to be detrimental to [Taylor]." DR 4-101(A).

We also conclude that the use of Taylor's financial information in the paternity action "would, or would likely,

inflict injury or damage upon [Taylor]." DR 5-105(C)(2). In the paternity action, Taylor sought to gain joint custody or, in the alternative, "sole care, custody, and control" of the child. He also sought to establish child support. As to both those issues, Taylor's financial status would have been at issue. The accused obtained that information in confidence from Taylor in the course of his representation of Taylor, and it unquestionably would have been useful to Brookins—and potentially harmful to Taylor—in the paternity action.

As noted previously, the accused argues that the information that he received from Taylor would have been revealed in a Uniform Child Support Affidavit, to be filed subsequently in the paternity action, and therefore cannot be considered a secret or confidence. The accused is incorrect. The paternity action concluded with a settlement, and Taylor never filed the uniform affidavit with the court. And even if Taylor had filed the uniform affidavit, the accused's information regarding Taylor's financial situation would have allowed him to determine whether the affidavit was incomplete or inaccurate—an advantage to his current client, Brookins, that he would not have had without the disclosure of that confidential information to him by Taylor. In any event, there was no requirement that the affidavit be filed until later in the litigation, and the accused's knowledge of the financial information at an earlier stage in the proceedings would have been detrimental to Taylor.

The accused's claim that the information in question could not have been a secret because Taylor had revealed all the information on the intake form to Brookins is not supported by the record. Brookins testified before the trial panel that she did not know Taylor's monthly and annual income, which was information that Taylor had provided to the accused on the intake form.

## III. SANCTION

We determine the appropriate sanction by examining the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and this court's prior decisions. *In re Gustafson*, 333 Or 468, 486, 41 P3d 1063 (2002). We begin by considering the duty

breached, the accused's mental state, the presence of actual or potential injury, and aggravating and mitigating factors.

■ In the Taylor matter, the accused breached his duty to preserve Taylor's property. ABA Standard 4.1. In the Brookins matter, the accused breached his duty to his former client, Taylor, by failing to avoid a conflict of interest. ABA Standard 4.3.

As to the accused's mental state, the accused knew that he was under an obligation to deposit Taylor's funds into his lawyer trust account, to provide Taylor with an accounting of those funds, and promptly to refund the unearned portion of those funds. The accused understood that, in the absence of a written fee agreement providing that the fees were nonrefundable and earned upon receipt, Taylor's payments should have been deposited into his trust account. Although the accused initially may have thought that Taylor had signed such a fee agreement, he knew or should have known that he did not have a signed agreement at some point prior to receiving the letter from Blodgett in May 2004.[6]

The accused also knew or should have known that his representation of Brookins violated DR 5-105(C)(2) because of the information that he had obtained during his prior representation of Taylor. The accused knowingly represented Brookins in the paternity action that Taylor had filed, and the face of the petition demonstrated that financial matters—as to which he had obtained secrets from Taylor—would be at issue. The accused may have thought that Taylor already had informed Brookins of the financial information on the intake form, and therefore that she already was privy to those secrets and confidences, but the accused did nothing to determine whether that was correct. Moreover, the accused did not attempt—or even, apparently, consider—whether he should make full disclosure to both Taylor and Brookins and obtain their written consent to his representation, as permitted by DR 5-105(D).

---

[6] Among other opportunities, the accused should have noticed the lack of the agreement when he periodically reviewed Taylor's file, when he purportedly closed Taylor's file, or when he reviewed the file to determine whether his representation of Brookins would create a conflict of interest.

The accused's conduct caused injury to Taylor, because the accused deposited Taylor's funds into his own bank account, did not account for that money to Taylor, and did not promptly return the unearned money at the close of his representation of Taylor. The accused also caused, at a minimum, potential injury to Taylor by representing Brookins in a subsequent matter adverse to Taylor, in which the confidences or secrets that Taylor had entrusted to the accused could have been used against Taylor.

The ABA Standards suggest that suspension is generally appropriate when a lawyer knows or should know that the lawyer is dealing improperly with client property and causes injury or potential injury to the client. ABA Standard 4.12. Suspension also is appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, thereby causing injury or potential injury to the client. ABA Standard 4.32. As described above, the accused knew or should have known that his handling of Taylor's funds was improper. The accused also knew the facts that created a conflict of interest in his representation of Brookins; his erroneous belief that the representation did not violate DR 5-105(C), of course, is no defense. We conclude that a suspension for some period is appropriate.

Several aggravating factors are present here. The accused, who was admitted to the Oregon Bar in 1983, has substantial experience in the practice of law. ABA Standard 9.22(i). The accused committed multiple offenses. ABA Standard 9.22(d). The accused made false statements to the Bar during the investigation, initially stating that he never represented Taylor and also stating that he had performed significant services for Taylor—both statements that the accused now admits were not accurate. ABA Standard 9.22(f). The accused previously received one prior letter of admonition for conduct similar to the conduct in this case—overcharging a client for costs and office expenses in a manner not permitted by the fee agreement. ABA Standard 9.22(a). No mitigating factors are applicable.

We turn to a consideration of this court's case law. This court suspended for 60 days an accused lawyer with substantial experience, but no prior disciplinary record, for violations of the trust account obligations set out in DR 9-101(A), DR 9-101(C)(3), and DR 9-101(C)(4). *In re Eakin*, 334 Or 238, 48 P3d 147 (2002). In that case, this court stated that, because the lawyer " 'should have known' that she was dealing improperly with the trust account[,]" and because of her "substantial experience in the practice of law," the required sanction was suspension from the practice of law. *Id.* at 259. The accused in that case had cooperated with the Bar's investigation, and fewer aggravating factors applied than apply here.

In *In re Knappenberger*, 338 Or 341, 108 P3d 1161 (2005), this court suspended an accused lawyer for 120 days for two violations of DR 5-105(C)—representing the wife in a dissolution proceeding and in a restraining order action after providing initial consultation regarding dissolution and related matters to the husband—and two violations of DR 7-104(A)(1), which prohibits lawyers from contacting represented parties. In that case, however, the accused had committed previous violations that demonstrated an "unsettling record" of communicating with represented parties. 338 Or at 361. *See also In re Hockett*, 303 Or 150, 163-64, 734 P2d 877 (1987) (30-day suspension appropriate for single violation of DR 5-105 with serious aggravating circumstances); *In re Wyllie*, 331 Or 606, 19 P3d 338 (2001) (four-month suspension for violating conflict of interest, trust account, and excessive fee rules, along with aggravating circumstances).

In our view, this case falls between *Eakin* and *Knappenberger*. As in *Eakin*, the accused, an experienced lawyer, violated rules regarding the proper handling of client funds. However, the accused here committed additional violations, including charging an excessive fee and violating the conflict of interest rule. The aggravating circumstances, however, are not as pronounced as in *Knappenberger*. Based on the foregoing, we conclude that a 90-day suspension is appropriate.

The accused is suspended from the practice of law for 90 days, commencing 60 days from the date of this decision.