Argued and submitted March 7, accused suspended from practice of law for one
year, commencing 60 days from effective date of decision, May 18, 2006

In re Complaint as to the Conduct of

ALLAN K. KNAPPENBERGER,

*Accused.*

(OSB 03-104; SC S52757)

135 P3d 297

Peter R. Jarvis, of Hinshaw & Culbertson LLP, Portland, argued the cause and filed the briefs for the accused. With him on the briefs was David J. Elkanich.

Stacy J. Hankin, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with one violation of *former* Disciplinary Rule (DR) 6-101(B) (neglecting a legal matter entrusted to the lawyer).[1] A trial panel of the Disciplinary Board found the accused guilty of that violation and suspended the accused from the practice of law for one year. The accused seeks review in this court. ORS 9.536(1); Bar Rules of Procedure (BR) 10.1 and 10.3. We consider the matter *de novo* and may adopt, modify, or reject the decision of the trial panel. ORS 9.536(3) and BR 10.6. The Bar has the burden of establishing the alleged misconduct by clear and convincing evidence. BR 5.2. For the reasons that follow, we conclude that the accused committed the alleged violation and that a one-year suspension is the appropriate sanction.

We find the following facts by clear and convincing evidence. The accused was admitted to practice law in 1973. He is an experienced domestic relations lawyer. In 1993, the accused represented Betty Jirmasek in a marital dissolution proceeding against her husband, Terry Kawamoto. In January 1994, the trial court signed a judgment dissolving the marriage. Among other things, that judgment contained the following provision:

> "8.   QUALIFIED DOMESTIC RELATIONS ORDER. Petitioner [Jirmasek] shall be awarded 50% percent of the increase in Respondent's [Kawamoto's] Edison Pension Trust benefit accrued from December 17, 1982 to November 19, 1993, and it shall be transferred to Petitioner by presentation of a Qualified Domestic Relations Order (QDRO). The court shall retain jurisdiction for the presentation of further evidence or to resolve any disputes as to any issues related to the Pension and Retirement Plan and to enter any necessary QDRO transferring any pension or retirement assets from Respondent to Petitioner and allowing Petitioner to transfer the funds from Respondent's retirement plan. The court shall retain jurisdiction until such

---

[1] The Oregon Rules of Professional Conduct became effective on January 1, 2005. The conduct at issue in this proceeding occurred before that date; we therefore refer to and apply the former Code of Professional Responsibility.

time as the order has been accepted by the Plan Administrator. The parties shall share equally the costs of preparing any QDRO necessary to effectuate this paragraph. Any QDRO prepared in connection with this paragraph shall be incorporated in and become a part of the Dissolution Judgment."

Shortly after the trial court entered that judgment, the parties jointly retained lawyer Scott Rasmussen to prepare a QDRO. In February 1994, Rasmussen sent both Kawamoto's lawyer, Ruth Pekelder, and the accused a proposed QDRO, asking them to review the document and then send it on to Kawamoto's pension plan administrator for approval. In April 1994, Pekelder sent the proposed QDRO to the pension plan administrator for review. In early June 1994, the pension plan administrator's lawyer, John Walsh, sent a letter to Pekelder, with a copy to the accused, informing her that the pension plan would honor the proposed QDRO if the court approved it. Walsh instructed Pekelder and the accused to send him a certified copy of the QDRO after approval by the court. Around that time, the accused spoke to Jirmasek by telephone and led her to believe that the matter had been completed.

Pekelder signed the proposed QDRO and sent it to the accused on June 28, 1994, with a letter asking the accused to sign it and send it to the court. The accused did not do so. In September 1994, Pekelder sent the accused a letter again asking him to sign and return the QDRO. Still the accused failed to respond or take any action to complete the matter.

In November 1994, Pekelder sent a final letter to the accused stating that it was up to him to protect his client's interest by finalizing the QDRO, and informing him that she was closing her file. The accused took no action in response to that letter.

Almost two years later, in September 1996, Walsh, the pension plan administrator's lawyer, sent a letter to Pekelder, with a copy to the accused, stating that he had reviewed the Kawamoto file and had seen that the pension

plan administrator had not received a court-approved, certified copy of the QDRO. Walsh concluded that letter with the following:

> "As you know, no benefits can be assigned to a former spouse unless the Plan Administrator is presented with a qualified domestic relations order which meets the requirements of Internal Revenue Code § 414(p). If no order has been or will be entered, please let us know."

The accused did not respond to that letter, nor did he take any steps to complete the QDRO.

The entire matter then languished until the spring of 2002, when Kawamoto decided to retire. The pension plan informed Kawamoto that the QDRO never had been finalized because the plan administrator had not received a court-certified copy of that document. Kawamoto called Jirmasek to ask her to contact the accused; he also called his own lawyer, Pekelder. Pekelder sent a letter to the accused on April 9, 2002, notifying him of the fact that Kawamoto had learned that the QDRO never had been entered and attaching all the earlier correspondence pertaining to the matter. She asked the accused to send her the signed order and offered to submit it to the court and to the pension plan.

On April 29, 2002, the accused sent a letter to Jirmasek informing her that there was a "problem" with the QDRO and asking her to call him as soon as possible. Shortly thereafter, the two spoke. In that conversation, Jirmasek expressed concern that the matter had not been completed, and the accused assured her that he would take care of it.

On May 28, 2002, the accused sent the 1994 proposed QDRO to Walsh again, with updated signature pages, to make sure that it remained acceptable to the pension plan. Two weeks later, Walsh responded with a letter to the accused informing him that the pension plan would honor the QDRO if it were approved by the court. On June 26, 2002, the accused sent the proposed QDRO to Pekelder for her signature. He himself had not signed the document. He asked Pekelder to return the proposed QDRO to him, at which time he would sign it and forward it to the court for approval. Pekelder signed and returned the document the next day.

Despite the accused's assurances to Jirmasek and to Pekelder, the accused did not immediately sign the QDRO and submit it to the court. Instead, he waited another seven weeks, until August 15, 2002, to take those actions, and then did so only after Pekelder again had contacted him and reminded him that the QDRO still had not been sent to the court. The court then entered the QDRO, but still the accused did not immediately perform the last remaining act necessary to conclude the matter, *viz.*, sending a court-certified copy of the QDRO to the pension plan administrator.

In the fall of 2002, Kawamoto called Jirmasek again and informed her that his planned retirement continued to be delayed because the accused still had not submitted the court-certified copy of the QDRO to the pension plan administrator. Jirmasek left a number of telephone messages for the accused, but he did not return her calls. Eventually Jirmasek telephoned Walsh, the pension plan administrator's lawyer, and was referred to another lawyer in Walsh's office, Lorne Dauenhauer. Dauenhauer confirmed that the pension plan had not received the court-certified copy of the QDRO and that, without that document, the plan could not divide the pension benefit. He also warned Jirmasek that, if Kawamoto died before the matter was completed, she might not be entitled to receive a surviving spouse annuity. Dauenhauer advised Jirmasek to contact the accused, to which she responded that she had tried but had been unable to reach him.

On November 26, 2002, Dauenhauer sent a letter to the accused and Pekelder, with copies to several other individuals, including Jirmasek, inquiring about the status of the QDRO. That letter informed the accused and Pekelder that, if he did not hear from them within 60 days, the pension plan administrator's lawyers "will presume that the Order will not be entered, and that * * * Jirmasek * * * does not intend to hold the Plan obligated to pay her any of * * * Kawamoto's Edison Plan pension benefits."

As Jirmasek later testified, she became angry and frightened when she received that letter. She immediately called the accused and demanded to know what he had been doing. The accused claimed not to have received

Dauenhauer's letter and asked Jirmasek to fax it to him, which she did.

On December 6, 2002, the accused finally sent a court-certified copy of the QDRO to Walsh. On December 16, 2002, Kawamoto's pension plan sent a letter to Jirmasek informing her that the QDRO would be enforced and outlining the benefits that she would receive. That letter concluded the accused's representation of Jirmasek, more than eight years after the trial court entered the order awarding Jirmasek a share of her ex-husband's pension benefits.

■     The Bar charged the accused with violating DR 6-101(B), which provides, "A lawyer shall not neglect a legal matter entrusted to the lawyer." The Bar asserts (and the trial panel concluded) that the foregoing recitation of the history of this matter establishes beyond argument that, for more than eight years, the accused neglected a legal matter entrusted to him—finalizing the QDRO and thereby ensuring that Jirmasek would be entitled to a share of her ex-husband's pension as contemplated in the marital dissolution agreement—and, in so behaving, violated DR 6-101(B).

The accused generally has admitted all the facts that we have described above, but nonetheless argues that he has not violated DR 6-101(B). According to the accused, there is no violation of that rule without a showing of harm or potential harm to the client's legal interest and, according to the accused, the Bar has failed to demonstrate by clear and convincing evidence that Jirmasek's legal interest either actually was harmed or was placed at material risk of harm by the accused's conduct.

In support of the proposition that harm is required, the accused relies primarily on a passing remark in *In re Walker*, 293 Or 297, 647 P2d 468 (1982), a case in which this court found that the accused lawyer had not neglected a legal matter. There, this court stated:

> "The record suggests delay in the accused's handling of the cases, but it does not establish neglect. There was no prejudice to the client as a result of the accused's handling the cases. The accused's handling of his client's litigation was not exemplary, but neither was it deserving of professional discipline."

293 Or at 301. The accused then attempts to bolster his argument with references to several neglect cases in which there was actual injury to the client: *In re Loew*, 292 Or 806, 642 P2d 1171 (1982) (lawyer who failed to file brief for client despite repeated requests to do so, and who failed to return any of about 40 telephone calls from client, did not contest court's conclusion that he was guilty of neglect); *In re Dugger*, 299 Or 21, 697 P2d 973 (1985) (lawyer guilty of neglect when, after filing construction lien for client, he determined that case lacked merit but never informed client or followed through with matter and did not return client telephone calls); *In re Kissling*, 303 Or 638, 740 P2d 179 (1987) (lawyer guilty of neglecting two different matters in which he failed to file complaint or to take any action to prosecute cases; in one case, statute of limitations had run); *In re Butler*, 324 Or 69, 921 P2d 401 (1996) (lawyer admitted he neglected legal matter when he filed complaint but failed to perfect service and case was dismissed with prejudice); *In re LaBahn*, 335 Or 357, 67 P3d 381 (2003) (lawyer who failed to serve complaint on defendant, to file proof of service with court within statute of limitations, and to return client telephone calls guilty of neglect).

At the outset, we observe that the accused's argument runs contrary to the very words of DR 6-101(B), which plainly state that it is the lawyer's conduct—not the resulting harm—that is at issue. The rule states that the lawyer "shall not neglect a legal matter." Nothing in those words suggests that the outcome of the neglect is relevant to the inquiry. In arguing that the case law supports his view that actual or potential harm to the client is required, the accused reads too much into *Walker* and misreads the other cases that he cited. In none of those cases does this court base its finding that a lawyer neglected a legal matter in violation of the disciplinary rules on the existence of prejudice or potential prejudice to the client's legal interest. To the contrary, our review of the case law demonstrates that the court's determination of neglect is based exclusively on the lawyer's conduct, and not on the resulting effect of that conduct on the client. Indeed, this court's recent discussion of the accused's own neglect of another client's legal matter makes the point explicitly. In *In re Knappenberger*, 337 Or 15, 90 P3d 614 (2004)

(*Knappenberger II*), this court stated that "[t]he neglect inquiry is not dependent on the outcome of the matter at issue." 337 Or at 23. Harm to the client resulting from the accused's conduct did not factor into this court's analysis of whether the accused violated the rule.[2]

This court has held that, to violate DR 6-101(B), the lawyer must engage in a course of neglectful conduct; a single instance of neglect is not sufficient to establish a violation. *Knappenberger II*, 337 Or at 23. However, that course of neglectful conduct need not span a long period of time. Even neglect over a period of as little as two months can constitute a violation of the rule. *See In re Meyer (II)*, 328 Or 220, 970 P2d 647 (1999) (court found that lawyer who rendered some services to client during two-month period neglected client's legal matter in violation of DR 6-101(B) because he failed to take any constructive action to protect or advance his client's interest).

In this case, the accused undertook to complete the QDRO matter as part of his representation of Jirmasek in her marital dissolution. He then failed to finalize the QDRO over a more than eight-year period, despite repeated requests to do so from Pekelder and from Jirmasek, and despite letters reminding him of his obligations from Kawamoto's pension plan. The accused's conduct in 1994 in ignoring letters and requests from Pekelder simply to sign the QDRO and return it to her is inexplicable. To let the matter then languish for eight years is inexcusable. But the accused's conduct in 2002, when the matter was brought to his attention again, is, if anything, still more disturbing. Nothing in the accused's behavior at that point reveals that he felt any sense of urgency to complete the matter that he already had neglected for so long. Instead, the accused still took more than eight months to complete the process. Based on the foregoing, we conclude that the accused engaged in a course of neglectful conduct and is guilty of the charge of neglecting a legal matter in violation of DR 6-101(B).

---

[2] Nothing in the foregoing discussion is meant to imply that harm to the client does not play any role in a neglect case. As will be discussed below, harm or potential harm caused to a client by the lawyer's neglect of a legal matter is relevant in determining the appropriate sanction.

■ We turn to the question of the appropriate sanction. The trial panel concluded that the accused should be suspended for one year, and the Bar agrees. The accused, however, argues that the appropriate sanction, were the court to conclude that he has violated the disciplinary rule, would be somewhere between a reprimand and a suspension of 120 days.

■ In determining the appropriate sanction after finding a lawyer guilty of misconduct, this court uses the analytical framework set out in the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards). Under that framework, we make an initial determination of a presumptive sanction based on: (1) the ethical duty violated; (2) the lawyer's mental state; and (3) the actual or potential injury caused. We then adjust that presumptive sanction based on a fourth factor, the presence of aggravating or mitigating circumstances. *See* ABA Standards 3.0 and at 5 to 6. Finally, we consider whether that adjusted sanction is consistent with Oregon case law. *Knappenberger II*, 337 Or at 30.

With respect to the duty violated, the ABA Standards provide that a lawyer owes a duty to the client to act with reasonable diligence and promptness when representing that client. ABA Standard 4.4. In regard to the accused's mental state, the accused acted with knowledge in neglecting Jirmasek's legal matter. Knowledge is defined as a conscious awareness of the nature or attendant circumstances of the conduct, but without a conscious objective or purpose to accomplish a particular result. ABA Standards at 7.

With regard to any actual or potential injury that the accused's conduct caused, this court has recognized that, apart from any injury to a client's legal interests, a client may suffer actual, psychological injury from a lawyer's neglectful conduct. As this court stated in *In re Dugger*, 299 Or 21, 29, 677 P2d 973 (1985),

"From a client's viewpoint, nonperformance by neglect, needless and unexplained delay, and especially failure to communicate or to respond to inquiries no doubt can be as

> frustrating as outright prevarication or some other discipli-
> nary violations can be, even when the neglect does not
> result in the ultimate loss of the client's objective."

In this case, as Jirmasek's testimony before the trial panel demonstrates, she suffered actual injury in the form of anger, fear, and frustration arising out of the accused's failure to act.

Apart from that injury, the accused argues, Jirmasek suffered no actual or potential injury to any legal interest. That is so, he argues, because the 1994 marital dissolution order met the legal criteria for a valid QDRO and, therefore, the pension plan administrator properly should have accepted it as such if it ever became necessary to do so (such as in the event of Kawamoto's untimely death). It follows, according to the accused, that Jirmasek's legal interest in her share of her ex-husband's pension was fully protected at all times.

We disagree that those facts establish that Jirmasek suffered no *potential* injury to her legal interests. Even if the marital dissolution order should have sufficed as a valid QDRO—a proposition that we find debatable, at best—the pension plan administrator had the final word on that subject. That is why the parties submitted the QDRO to the pension plan administrator's lawyer for approval before asking the court to enter the order. In addition, Kawamoto's pension plan required that a certain procedure be followed before it would honor *any* QDRO. Thus, even if the marital dissolution order could have been sufficient by itself to protect Jirmasek's rights (a concept that even the accused had not considered until the pendency of this disciplinary proceeding), the fact remains that the accused did not complete all the tasks that he had agreed to perform to protect Jirmasek's rights until he submitted the certified copy of the court-approved QDRO to the pension plan administrator in December 2002. Finally, even if the accused were correct that a reasonable pension plan administrator legally should have recognized the marital dissolution order as a valid QDRO, the point remains that the actual position of the pension plan, as evidenced by multiple letters from the pension plan administrator's lawyers, was that it would not recognize Jirmasek's right to benefits until it received a court-approved certified copy of the QDRO.

Accordingly, had Kawamoto died before the QDRO was finalized, Jirmasek, at a minimum, would have been required to undertake substantial effort and expense, including, perhaps, litigation, to establish the fact that the marital dissolution order would have sufficed.

We conclude that Jirmasek's eligibility for benefits was at risk until Kawamoto's pension plan administrator agreed to honor the court-approved QDRO. It follows that the accused's neglect in failing to finalize the QDRO caused potential injury to Jirmasek's legal interests.

Drawing together the factors of duty violated, mental state, and injury, we find preliminarily that a suspension is the appropriate sanction. ABA Standard 4.42 provides:

"Suspension is generally appropriate when:

"(a)  a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

"(b)  a lawyer engages in a pattern of neglect and causes injury or potential injury to a client."

We next consider the applicable aggravating and mitigating circumstances to determine whether we should adjust the preliminary sanction. The accused concedes the presence of two aggravating factors: he has committed prior disciplinary offenses, ABA Standard 9.22(a), and he has substantial experience in the practice of law, ABA Standard 9.22(I).[3] With regard to the accused's prior disciplinary record, the accused concedes three pertinent prior disciplinary actions. First, the accused stipulated to a reprimand in 2000

---

[3] The trial panel also found, and the accused disputes the existence of, a third aggravating factor: refusal to acknowledge the wrongfulness of his conduct. ABA Standard 9.22(g). In that connection, we agree with the accused that a lawyer's refusal to concede that the Bar has established guilt in a disciplinary matter ordinarily is not an aggravating factor. *In re Davenport*, 334 Or 298, 321, 49 P3d 91 (2002). Every lawyer has the right to defend himself or herself against accusations respecting his or her personal character or professional integrity and responsibility without risking a greater sanction for doing so. *Id.* On the other hand, even this rule has its limits. A lawyer's refusal to recognize the wrongfulness of his or her conduct may be an aggravating factor when, viewed objectively, no reasonable lawyer could have thought that that conduct was permissible. But this is not such a case.

for a single violation of DR 7-104(A)(1) (knowingly contacting represented person on subject directly related to representation). *In re Knappenberger*, 14 DB Rptr 148 (2000) (*Knappenberger I*). Second, in *Knappenberger II*, this court found the accused guilty of one violation of DR 5-101(A) (conflict of interest with lawyer's self interest), for the accused's conduct during the period January to February 1994, and of one violation of DR 6-101(B) (neglecting a legal matter), for conduct that took place from September 1999 to July 2000. And third, in *In re Knappenberger*, 338 Or 341, 108 P3d 1161 (2005) (*Knappenberger III*), this court found the accused guilty of one violation of DR 7-104(A)(1) (communicating with a represented person on subject directly related to representation), for conduct that took place in March 2000, and of one violation of DR 5-105(C) (former client conflict of interest), for his conduct in representing both parties in a divorce proceeding from October to December 2000.

■   The court assigns prior disciplinary offenses varying degrees of weight in aggravation depending on several factors, including:

> "(1) the relative seriousness of the prior offenses and resulting sanction; (2) the similarity of the prior offense to the offense in the case at bar; (3) the number of prior offenses; (4) the relative recency of the prior offense; and (5) the timing of the current offense in relation to the prior offense and resulting sanction, specifically, whether the accused lawyer had been sanctioned for the prior offense before engaging in the offense in the case at bar."

*In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997). With that approach in mind, we assign little weight to *Knappenberger I*. In that case, the accused's conduct in making contact with a represented person was not similar to the neglectful conduct at issue here. In addition, as noted, the accused stipulated to a reprimand in that case. This court has stated that a stipulation for discipline has no precedential value because stipulated sanctions providing for a reprimand or suspension not to exceed six months are not reviewed by this court and because "[m]any facts and circumstances, most of which are not readily discernable from the public record, motivate a lawyer and the Bar to enter into a stipulation." *In re Murdock*, 328 Or 18, 24 n 1, 968 P2d 1270 (1998).

We do take seriously, however, *Knappenberger II* and *Knappenberger III*. Those two cases together detail four distinct violations of the disciplinary rules. One of those, *Knappenberger II*, involved a violation of the same disciplinary rule that is at issue here. Indeed, the accused's conduct in violating DR 6-101(B) in that case was virtually identical to his conduct here. All the prior violations were relatively serious and they resulted in a 90-day suspension in *Knappenberger II* and a 120-day suspension in *Knappenberger III*. All the prior offenses took place relatively recently and all were "adjudicated prior to the imposition of the sanction in the current case," a consideration that this court highlighted in *Jones*, 326 Or at 200 ("prior offenses" aggravating factor refers to offenses that were adjudicated prior to imposition of sanction in current case). However, the accused was not sanctioned in the earlier cases before engaging in the offense in the case at bar.

As this court stated in *Knappenberger III*, and as is even more pertinent today, all the accused's offenses, taken together, "present an unsettling record of violating the disciplinary rules." 338 Or at 361. Indeed, they carry significant weight in aggravation, because their presence "demonstrates that the accused is careless with respect to his ethical obligations." *Meyer (II)*, 328 Or at 229; *see also Jones*, 326 Or at 201 (to same effect).

In mitigation, the trial panel found, and the Bar concedes, the absence of a dishonest or selfish motive, ABA Standard 9.32(b), and the accused's full cooperation in the disciplinary proceedings, ABA Standard 9.32(e).[4]

Turning to this court's case law, we think that the case that most closely resembles the instant case is *Meyer (II)*. In *Meyer (II)*, the accused lawyer undertook to represent a client whose wife had sued him for divorce, served him with

---

[4] The accused also asserts that "[t]he trial panel * * * failed to take into consideration the extensive evidence of interim rehabilitation that was presented by [the accused]. * * * *See* ABA Standards 9.32(k)." The accused ignores the trial panels' express factual finding of "no evidence" to support his claim of interim rehabilitation. And, in any event, in 1992, "interim rehabilitation" was deleted from the ABA Standards' list of factors that the court should consider in mitigation; it has not been on the list since that time.

an order *pendent lite* for child and spousal support, and notified him of a hearing on the support matter scheduled for about a week thereafter. At the time that the client retained Meyer, he told Meyer that his primary concern was the temporary support order, because he felt that it threatened to overwhelm his income. Soon thereafter, Meyer failed to file a required affidavit and failed to respond to a show cause order. He also cancelled the support hearing, telling his client that the hearing was unnecessary. The client's wife then filed a proposed support order with the court. When Meyer failed to respond, the court signed the order, obligating the client to a significant monthly payment plus attorney fees and court costs. Over the next two months, Meyer attended a meeting with opposing counsel unprepared and failed again to submit the required affidavit, notwithstanding having been reminded to do so several times by his client. During that time, Meyer also failed to return client telephone calls and failed to respond to the wife's motion to amend the support order. The trial court then issued a second, amended order. Meyer failed to keep the client up to date on the support issues and, in particular, failed to inform him that he was in default on two different support orders. Ultimately, the client's wages were garnished, and the client confronted Meyer and terminated the representation.

In the subsequent disciplinary proceeding, this court found Meyer's conduct with respect to that client over the two-month period of the representation to constitute a course of neglectful conduct in violation of DR 6-101(B). In determining an appropriate sanction, the court reviewed the aggravating and mitigating circumstances surrounding the violation. The court observed that Meyer had had two prior disciplinary adjudications—a reprimand for neglecting another legal matter nine years earlier, and a 90-day suspension in a case decided the same day as *Meyer (II)*, which involved violations of DR 1-102(A)(4) (conduct prejudicial to the administration of justice) and DR 7-106(C)(6) (undignified and discourteous conduct degrading to a tribunal). *In re Meyer (I)*, 328 Or 211, 970 P2d 652 (1999). Although this court concluded that the disciplinary offenses at issue in

*Meyer (I)* carried no weight in isolation because they were dissimilar to those presented in *Meyer (II)* and because the sanction in *Meyer (I)* was imposed after the accused committed the conduct at issue in *Meyer (II)*, the court nonetheless viewed the aggregate weight of all the earlier violations as significant.

The court also found that Meyer had substantial experience in the practice of law. The court found no mitigating factors. Based on all the foregoing factors, the court suspended Meyer for a period of one year.

In the present case, the actual harm that Jirmasek suffered was not as serious as the harm to the client in *Meyer (II)*, but the accused's neglectful conduct took place over a much longer period of time, during which the accused was reminded numerous times of his obligations and had ample opportunity to rectify the situation. As described in detail above, the accused's history of prior discipline is more significant than the lawyer's in *Meyer (II)*. And, like the lawyer in *Meyer (II)*, the accused has substantial experience in the practice of law. It is true that we have found some factors in mitigation here, but we are not persuaded that they distinguish this case from *Meyer (II)* in any significant respect. Based on those considerations, our factual findings, the ABA Standards, and this court's case law, we conclude that the accused should be suspended from the practice of law for a period of one year.

The accused is suspended from the practice of law for one year, commencing 60 days from the effective date of this decision.