Argued and submitted March 6, accused suspended from practice of law for two years, commencing 60 days from date of filing of decision August 14, 2008

In re Complaint as to the Conduct of

## ALLAN F. KNAPPENBERGER,
*Accused.*

(OSB 05-54, 05-109, 05-110; SC S054821)

186 P3d 272

Roy Pulvers, Hinshaw & Culbertson LLP, Portland, argued the cause and filed the reply brief for the accused. With him on the reply brief was David J. Elkanich. Allan F. Knappenberger filed a brief *pro se*.

Stacy J. Hankin, Assistant Disciplinary Counsel, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged Allan F. Knappenberger (the accused) with four violations of the Disciplinary Rules (DR) of the Oregon Code of Professional Responsibility[1] in three causes of complaint. In the Miller matter and the Albright matter, the Bar alleges that the accused violated DR 2-106(A) (lawyer may not charge illegal or clearly excessive fee). In the Dobler matter, the Bar alleges that the accused violated DR 1-102(A)(4) (lawyer may not engage in conduct prejudicial to the administration of justice) and DR 7-106(A) (lawyer may not advise client to disregard court order). A trial panel of the Disciplinary Board concluded that the accused had violated the rules as alleged. Based on those violations, and on a variety of other violations of the disciplinary rules for which the accused had been sanctioned in other proceedings, the trial panel permanently disbarred the accused.

The accused seeks review in this court pursuant to ORS 9.536(1) and Bar Rule of Procedure (BR) 10.1. The accused challenges the findings and conclusions of the trial panel concerning the Miller and Dobler matters and the trial panel's sanction. The accused does not contest the findings and conclusion of the trial panel concerning the Albright matter. We review bar disciplinary matters *de novo*. ORS 9.536(2); BR 10.6. For the reasons that follow, we conclude that the accused violated the disciplinary rules as charged in the Miller and Albright matters, but not in the Dobler matter. As to sanction, we suspend the accused from the practice of law for two years.

## MILLER MATTER

The Bar alleges that the accused violated DR 2-106(A) by charging and collecting a fee from Eric Miller for legal work in connection with a social security claim without the prior approval of the Social Security Administration (SSA). DR 2-106(A) provides, "A lawyer shall not enter into

---

[1] The Oregon Code of Professional Responsibility applies to the conduct at issue in this case because it occurred prior to January 1, 2005, the effective date of the Oregon Rules of Professional Conduct.

an agreement for, charge or collect an illegal or clearly excessive fee." The Bar alleges that Miller engaged the accused to obtain disability benefits for him from the SSA and that the accused sent bills to Miller and collected fees from Miller and from his parents, Joe Miller and Virginia Miller, for that work. The Bar contends that the accused charged and collected an illegal fee for that legal work because federal regulations provide that an attorney may not charge for such work or receive a fee unless the SSA has given prior approval to the attorney to bill and collect for that work. Specifically, 20 CFR § 404.1720(b)(3) provides:

"A [lawyer or legal representative of a disability claimant] shall not charge or receive any fee unless we have approved it, and he or she shall not charge or receive any fee that is more than the amount we approve. This rule applies whether the fee is charged to or received from you or from someone else."

The Bar asserts that the SSA never approved any charges by the accused for his representation of Miller. As we describe in greater detail below, the accused responds that, although he billed and was paid for other legal work that he did for Miller, he never "charged" Miller for the SSA matter because he had an oral agreement with Miller that entries for the SSA matter on the monthly bills were not to be considered "charges" and were not to be paid.

The accused testified that he explained to Miller in a meeting on November 15, 2001, that he could not bill or collect fees for the SSA matter until those fees were approved by the SSA, and the accused contends that his contemporaneous notes support that testimony. The accused asserts that he informed Joe Miller of that arrangement after the November 15 meeting with Miller. The accused also argues that, even after the Millers read that same information in an SSA pamphlet in May 2003, they did not contest the accused's billings; that they never questioned the billings either orally or in writing; and that they did not mention the issue when they fired the accused in March 2004. He asserts that the Millers did not raise the issue because they understood that he was not "charging" Miller for the SSA work.

In June 2003, the accused filed an Appointment of Representative form with the SSA in which he agreed that he would "not charge or collect any fee for the representation * * * unless it has been approved in accordance with the [applicable] laws and rules * * *." He states that he shared that document with the Millers. The accused also argues that, because there was always a total outstanding balance of over $21,000 on the bills, and the monthly payments from the Millers averaged only $2,000, none of the fees that they paid actually were applied to the SSA matter, but rather were applied to fees that Miller owed the accused for work on other matters. In short, the accused contends that his bills were not really "charges" because he never expected to receive payment from the Millers for the SSA entries.

The Millers testified that the accused did not inform them that he could not charge for the SSA matter until he had received permission from the SSA. They testified that they learned of that rule from an SSA pamphlet in May 2003 and that when Miller brought that information to the attention of the accused, the accused took the pamphlet from him and never explained why he was billing for the SSA matter. The Millers admit that they did not raise that issue with the accused again, either orally or in writing. After the Millers fired the accused in March 2004, they hired another attorney to pursue Miller's benefits claim, and Miller was awarded benefits within several months. The accused then petitioned the SSA for fees for his work on Miller's SSA matter. The Millers opposed that fee request and stated to the SSA administrative law judge (ALJ) that the accused had already charged and been paid for the SSA matter. The ALJ stated that the accused's statements that he had not charged and collected fees for the SSA matter "were not well taken" and rejected the accused's petition for attorney fees.

On *de novo* review, we find that the Bar proved the following facts by clear and convincing evidence. In November 2001, the accused was representing Miller on several legal matters, including a marital dissolution. On November 15, 2001, the accused and Miller met to discuss a possible claim by Miller to receive disability benefits from the SSA, and the accused agreed to pursue such a claim. On November 25, 2001, the accused sent Miller a bill that

included three entries for the SSA matter. The bill included entries for four separate legal matters, but the SSA matter was not listed as a separate matter. Instead, the SSA matter entries were listed under the dissolution matter heading. The accused continued to work on the SSA and dissolution matters and to bill in that way until May 2003. The summary pages for the bills that the accused sent from November 2001 to April 2003 included the SSA matter charges in the total amount charged for the dissolution matter and in the total amount due. The bills did not include a separate total for the charges for the SSA matter. The May 2003 bill listed several entries for the SSA matter under the dissolution matter and also listed several entries under a new matter heading entitled "SOCIAL SECURITY CLAIM." On the summary page for that May 2003 bill, the SSA matter and the dissolution matter charges were added together to calculate a total amount of current charges and a total balance due.

There is no indication on any bill that the SSA matter billing was for informational purposes only or that the accused did not expect the Millers to pay the charges for the SSA matter. In June 2003, the accused sent Miller a summary statement with separate pages for each matter. On the page for the SSA matter, the summary statement states, "Balance Now Due $638.15." The summary statement for the dissolution matter similarly states, "Balance Now Due" and the total amount due includes fees for the SSA matter entries that were listed under the dissolution matter in earlier bills. The later bills set out the total balance from the prior bill, indicate the amount subtracted for "payments received" and the amount added for "current charges"—including those for the SSA matter. The bills identify the resulting number as the "Balance Now Due." We find that the accused charged Miller for SSA work.

■ We also find by clear and convincing evidence that the SSA had not authorized the accused to bill Miller for the work on Miller's benefit claim, as required by 20 CFR § 404.1720. Accordingly, we conclude that the accused charged Miller an illegal fee, in violation of DR 2-106(A).

As noted, the accused nevertheless argues that he had an oral agreement with Miller that the fees for the SSA

matter did not need to be paid and therefore were not "charges." We rejected a similar argument in *In re Balocca*, 342 Or 279, 151 P3d 154 (2007). In that case, the Bar accused Balocca of depositing client funds into his own account. The accused conceded that he had deposited the client's funds into his own account, but asserted that he had a written agreement with his client that the funds were nonrefundable and were deemed earned upon receipt. The accused was unable to produce the written agreement, but he argued that the Bar had failed to prove "that no such agreement existed." 342 Or at 288. We rejected that argument. We stated that

> "although the Bar has the burden of proving the alleged violations by clear and convincing evidence, it does not have the burden of proving the nonexistence of the fee agreement. Rather, because the accused sought to rely on the existence of the fee agreement to justify his handling of Taylor's payments, it is his burden to demonstrate the existence of such an agreement."

*Id.* at 289. Here, the accused similarly seeks to rely on the existence of an alleged agreement with respect to the fee to prove that his bills do not mean what they otherwise plainly indicate—that he charged his client for work on the SSA matter. As noted, no credible evidence supports the accused's contention, and contemporaneous written documents contradict it.

## DOBLER MATTER

Many of the facts with respect to the Dobler matter are undisputed, and we set them out first to provide the context for the central factual issue that is disputed: whether the accused advised Dobler to disregard a court order. The accused represented Rebecca Dobler (mother) in a marital dissolution in 2003 and 2004. In August 2003, the court entered an order that included the parties' arrangement for parenting time of their child during the dissolution proceeding. That arrangement and order specified that father was to have time with the child every Friday morning for four hours. On the morning of December 3, 2003, the accused faxed a letter to Engel, father's attorney, that listed various support issues that the parties were planning to discuss at a hearing that afternoon before Washington County Circuit Court

Judge Keith Raines. Included in that letter was a statement that mother would not deliver the child to father in Portland on Friday, December 26, 2003, because mother and the child planned to vacation in Bend with relatives from December 24 through December 28. The letter proposed that, in exchange, father would receive additional parenting time on future holidays. That issue had not been scheduled for the hearing that day, and there are no documents that show that the issue was discussed or resolved on December 3. Neither the accused nor Engel documented any response to or discussion of mother's proposed plan for December 26, or the lack of any response to the plan.

On December 15, mother and the accused met to discuss various issues concerning the dissolution, including mother's plan for December 26. After that meeting, mother left voicemail messages on December 17 and 19 for father on father's secondary telephone number restating her plan for December 26. Father did not reply to those voicemails, apparently because they were not left on his primary telephone number, and he did not hear them until December 22. The accused and mother talked further on December 20 concerning that issue and father's lack of response. On Sunday, December 21, mother met father when he picked up the child, and neither mentioned mother's plans for December 26. When asked at the accused's disciplinary hearing why she did not raise the issue with father, mother responded, "Well, because I was told by Mr. Knappenberger that [father's] silence means no objection, so why would I raise the question to get an objection?"

On Monday, December 22, the accused faxed a letter to Engel stating that, because father had "failed to object to my client[']s proposal to take the child for all of Friday, December 26, 2003[,]" mother would keep the child that day. Engel responded the same day that father "and his family have plans with [child] on Friday morning. [Mother] should follow the normal Friday schedule." Later that day, the accused faxed another letter to Engel stating that Engel had not told the accused that father objected to the plan and that mother had already made plans based on father's "failure to timely object." The accused wrote, "Your failure to respond to

the [December 3] letter in writing resulted in [mother] solidifying her plans which she will proceed with." The accused also faxed to mother copies of his two letters to Engel and of Engel's letter to him. In his letter to mother that accompanied those letters, the accused stated, "Please proceed with your plans as we discussed over the weekend which is reiterated in my letter to Mr. Engel enclosed herein."

The accused and Engel continued to exchange letters on the issue. (There is some uncertainty about exactly when certain letters were sent or received, but those details are not material to the issues before us.) Engel wrote to the accused that he had told the accused orally on December 3 that father objected to the December 26 plan and that he would file a contempt motion against mother if she did not deliver the child to father on December 26. The accused responded that Engel had not said anything about the issue on December 3 and that a contempt motion would be a "waste [of] time and money" because father had failed timely to object to mother's plans. The accused faxed those letters to mother at her office on December 24. Meanwhile, mother had left Portland on December 24 to drive, with child, to Bend. The office manager at mother's office reviewed the letters, including Engel's letter threatening to seek to have mother held in contempt of court. The office manager called mother (who was en route to Bend) on her cell phone and read the letters to her. Mother then called the accused, discussed the matter with him, and proceeded to Bend. Mother did not deliver the child to father on December 26.

Engel, on behalf of father, later filed a motion to hold mother in contempt for violating the parenting time order. The court found mother in contempt and awarded father $2,500 in attorney fees and four additional hours of parenting time. At the contempt hearing, mother testified that she had solidified her plans to take the child to Bend on December 21 after father had picked the child up from her that afternoon and had not objected to her plans. Father testified that he had not heard the voicemail messages from mother until December 22. Mother also testified at the contempt hearing that although she had learned on December 22 that father objected to her plans for December 26, she still

thought that it was permissible for her not to return the child that morning and to keep the child that day or to return the child later that day (instead of the scheduled drop-off at 7:00 a.m.). Mother testified that, although she became aware of the threatened contempt motion, she believed that it was acceptable for her to not deliver the child to father on that day. She stated, "[s]ince [father] didn't object * * * it was okay to modify the schedule." The court found that mother had known of father's objections before she had left Portland for Bend. The court therefore rejected her estoppel and detrimental reliance defenses to the contempt motion.

■ The Bar argues that the accused (1) advised his client to disregard an order of the court and (2) engaged in conduct prejudicial to the administration of justice. DR 7-106(A) provides:

"A lawyer shall not disregard or advise the lawyer's client to disregard a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding but the lawyer may take appropriate steps in good faith to test the validity of such rule or ruling."

DR 1-102(A)(4) provides that it is professional misconduct for a lawyer to "[e]ngage in conduct that is prejudicial to the administration of justice[.]" To establish a violation of that rule, the Bar must prove

"(1) that the accused lawyer engaged in 'conduct' by doing something that the lawyer should not have done or by failing to do something that the lawyer was supposed to do; (2) that the conduct occurred during the course of a judicial proceeding or another proceeding that has the trappings of a judicial proceeding; and (3) that the conduct was prejudicial because it involved several acts that caused some harm to the administration of justice or because it involved a single act that caused substantial harm to the administration of justice."

*In re Eadie*, 333 Or 42, 55, 36 P3d 468 (2001).

The Bar alleges that the accused violated both of those rules because, on or before December 20, 2003, the accused "advised [mother] that she need not deliver the child on December 26, 2003[,]" and because the accused "did not alter that advice even after Engel objected, reminded the

Accused of the prior court order and threatened to file a motion for contempt." The Bar argues that the evidence demonstrates that the accused instructed his client to disregard a court order when he advised her, prior to December 21, that she did not need to deliver the child to father on December 26; when he wrote to mother on December 22—after Engels' letter expressing father's objections—to "proceed with your plans as we discussed"; and when he allegedly told mother in the telephone call on December 24 that she need not return to Portland and deliver the child to father on December 26, but instead could proceed to Bend. The Bar also relies on mother's testimony that the accused never informed her that there was a risk that she could be found in contempt if she did not deliver the child to father on December 26.

The accused's response is simple: he asserts that he did not tell mother to disregard the court order concerning parenting time. He contends that he advised mother only that, if father failed to respond to the proposal to modify the visitation plan and she changed her circumstances in reliance on father's silence, then mother would have a defense to a contempt action if she chose to violate the court order. The accused denies that he ever advised mother to disregard the court order.

The accused also relies on Judge Raines's findings at the contempt hearing that "[mother] knew full well, even before she left, that she * * * ran the risk of being in contempt of court. She chose to do things differently." Judge Raines testified at the trial panel hearing that there was "nothing improper" about the accused's defense; it simply failed because mother had heard from father before leaving for Bend. (The accused testified before the trial panel that he thought the defense was still valid even after receiving the objection from father on December 22 because mother had already changed her plans on December 21 in reliance on father's failure to object.) The Bar contends that Judge Raines's conclusions do not support the accused because his assessment of the accused's defense and behavior was based on incomplete information. The Bar points out that Judge Raines had not seen the letter from the accused to mother saying that she should proceed with her plans and had not known of the accused's alleged advice to mother on

December 24, that she should proceed to Bend and not deliver the child on December 26.

To prove that the accused violated DR 7-106(A) and DR 1-102(A)(4), the Bar needs to show by clear and convincing evidence that the accused advised his client to disregard the order regarding parenting time. As noted, the Bar points to the accused's December 22 letter to mother to "proceed with your plans." The Bar also relies on mother's testimony that the accused did not tell her that she ran the risk of being held in contempt for not returning the child and that, when she inquired about that risk on December 24, the accused told her that she did not need to be concerned with that risk.

In response, the accused testified that he did tell mother that she risked being held in contempt if she violated the order and that his letter to her of December 22 did not tell her to disregard the court order. He asserted that the December 22 letter referred instead to his advice to mother that, if she decided not to deliver the child to father on December 26, she would have a defense to a motion for contempt based on her detrimental reliance[2] on father's silence following the December 3 request. The accused testified that, during the December 24 telephone conversation, he had advised mother that "she had a good defense to any claim of contempt based upon the theory * * * [of] detrimental reliance." He also testified that,

"[S]he had her choice whether to come back or go. And I told her that I thought she had a—she had a—in my opinion, we

---

[2] The accused's "detrimental reliance" theory was that mother had relied on father's lack of objection to her plan when she confirmed, on December 21, her brother's travel from Texas and her grandparents' travel from John Day to Bend for that week's holiday celebration. We need not, and do not, reach any conclusion regarding the validity of an estoppel defense to a charge of contempt stemming from a violation of a parenting time agreement in a court order. The accused's detrimental reliance theory was not, according to Judge Raines, wholly without merit; it simply was not supported by the facts, because mother was aware of father's objections before traveling to Bend. Judge Raines testified to the trial panel that, although detrimental reliance was not a modification of the order, it was a valid defense.

"The lawyer can advise, 'You've got a court order. You're in peril if you don't follow the court order. But I can't control what you're going to do, and I'll make an argument for you saying that you thought you had a right to do it based on the circumstances.' I think a lawyer can do that."

had a defense to the contempt [motion]. So she, notwithstanding my advice, could have elected to come [back to Portland], not go to Bend and wait until the 26th, but it was her decision."

We cannot find, from the evidence in this record, that it is "highly probable" that the accused told mother to disregard the court order. *See In re Gustafson,* 333 Or 468, 470, 41 P3d 1063 (2002) (reiterating earlier holdings that "clear and convincing" evidence standard means that the truth of the facts asserted is highly probable). Although mother testified that the accused never told her that she might be held in contempt, that testimony is not supported by her testimony at the contempt hearing or the findings of Judge Raines. Moreover, mother did not mention the accused's alleged advice that she could disregard the order without risk during the contempt hearing in February 2004, and she did not mention or complain of it in her letter to the accused when she fired him in April 2004 or in her first two letters to the Bar concerning the accused. That history undercuts our ability to find, by clear and convincing evidence, that mother's recollection of those events is accurate and that the accused's recollection is inaccurate.

■    We do not consider whether the advice that the accused gave mother with respect to the detrimental reliance defense was correct. The trial panel opined that, "The Accused told his client to disregard a court order on the extremely weak theory that the order had been changed by estoppel * * *." However, the issue before us is not the strength or weakness of the theory, but whether the accused advised mother to disregard the court order. Regardless of whether the theory was "weak" or not, the accused would have violated the disciplinary rule if he had advised his client to disregard the court order. Even if the facts had been different and had strongly supported the detrimental reliance theory, the accused would have violated DR 7-106 if he had told mother to disregard the order instead of merely advising her that she had a possible defense to a motion for contempt if she chose to violate the court order.[3] Although the Bar has

_____

[3] DR 7-106(A) provides an exception to the rule against advising a client to disregard a court order when the attorney is taking "appropriate steps in good faith to test the validity of such rule or ruling."

argued extensively and persuasively that the accused's detrimental reliance theory was weak, that does not support—by clear and convincing evidence—its assertion that the accused told his client to disregard the court order. The accused may have provided poor legal advice, as the trial panel also concluded, but the Bar's complaint asserts that the accused violated DR 1-102(A)(4) and DR 7-106(A) when he advised his client to ignore the court order and not deliver the child to father on December 26. The bar failed to prove by clear and convincing evidence that the accused advised mother to disregard the parenting order. It therefore failed to prove the charged violation of DR 1-102(A)(4) and DR 7-106(A).

## ALBRIGHT MATTER

As noted previously, the accused does not dispute the trial panel's conclusion that he violated DR 2-106(A) in the Albright matter. However, because the violation in the Albright matter plays a role in our sanctions analysis, we discuss that matter briefly. The accused, while suspended from the practice of law, was working as a legal assistant for another attorney, Todd, on a dissolution matter for Albright, who had retained the accused prior to his suspension. The trial panel found that Todd's office charged Albright's credit card $7,000 for services rendered, that those services had been rendered, and that Albright had authorized that charge. Albright later terminated Todd's legal services, challenged the fee, and filed a Bar complaint. In response to the challenge to the fee, the accused—by then practicing again after the expiration of his suspension—prepared an affidavit concerning the services and the fee. He then prepared and sent Albright a bill charging her a fee for the time spent preparing and editing that affidavit. The trial panel concluded that such a charge was an excessive fee because this court has held that an attorney may not charge a client for time spent in a fee dispute. *In re Benett*, 331 Or 270, 278, 14 P3d 66 (2000) (so stating and citing cases holding that charging client for time spent on fee dispute with client or responding to Bar complaint constitutes excessive fee); *In re Paulson*, 335 Or 436, 71 P3d 60 (2003) (charging client for responding to client's Bar complaint constituted violation of DR 2-106(B)). The accused does not dispute those conclusions.

## SANCTION

■■      In determining the appropriate sanction in a lawyer disciplinary proceeding, this court first considers the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards). *In re Schaffner*, 323 Or 472, 478, 918 P2d 803 (1996) (illustrating principle). We consider the duty violated, the accused's mental state, and the actual or potential injury that the misconduct caused. ABA Standard 3.0. Next, we determine if there are any aggravating or mitigating circumstances, which would support an adjustment of the sanction determined under the first step. And finally, we review our case law to ensure that the sanction that we impose is consistent with our prior cases. *In re Fitzhenry*, 343 Or 86, 108, 162 P3d 260 (2007).

■      The accused violated his duty to the legal profession in the Miller and Albright matters. ABA Standard 7.0; *see Paulson*, 335 Or at 441 (finding duty to legal profession violated for violation of DR 2-106(A)). The accused asserts that his mental state in the Albright matter was "knowing," not "intentional." The ABA Standards provide that "intent" is "the conscious objective or purpose to accomplish a particular result," while "knowledge" means having an awareness of the nature of the conduct but acting without that objective or purpose. ABA Standards at 12. Based on the evidence described above, we find that the accused had the objective and purpose of charging Miller an illegal fee and of charging Albright an excessive fee for services. The accused acknowledged that he knew that federal law barred him from charging for work done on Miller's SSA matter without prior authorization from the SSA. The accused also acted intentionally in the Albright matter by charging fees for his time spent in the fee dispute with the former client, when this court has held that such charges are not permitted. *See, e.g.*, *Benett*, 331 Or at 278-80 (finding that accused acted intentionally in billing client for time spent in fee dispute).

■      We also find that the accused's conduct created the potential for injury. The accused's conduct could have caused both Miller and Albright to pay charges that they did not owe. *See Paulson*, 335 Or at 442 (finding potential for injury

when lawyer improperly billed client for time spent in fee dispute with client). The ABA Standards provide for the same sanction regardless of whether the injury is actual or potential. ABA Standards 7.1 - 7.4; *accord In re Fitzhenry*, 343 Or at 109.

Based on those findings, the presumptive sanction is a suspension. ABA Standard 7.2. As to aggravating and mitigating factors, several are essentially undisputed. There are multiple offenses, ABA Standard 9.22(d), and the accused has substantial experience in the practice of law. ABA Standard 9.22(i). On the mitigation side of the ledger, the accused fully cooperated with the disciplinary process. ABA Standard 9.32(e).

We now turn to what the Bar argues is a particularly significant aggravating factor: the accused's prior disciplinary record. In 2006, this court suspended the accused for one year for neglect of a legal matter. *In re Knappenberger IV*, 340 Or 573, 135 P3d 297 (2006). In that opinion, we summarized the accused's disciplinary record:

> "First, the accused stipulated to a reprimand in 2000 for a single violation of DR 7-104(A)(1) (knowingly contacting represented person on subject directly related to representation). *In re Knappenberger*, 14 DB Rptr 148 (2000) (*Knappenberger I*). Second, in *Knappenberger II*, this court found the accused guilty of one violation of DR 5-101(A) (conflict of interest with lawyer's self interest), for the accused's conduct during the period January to February 1994, and of one violation of DR 6-101(B) (neglecting a legal matter), for conduct that took place from September 1999 to July 2000. And third, in *In re Knappenberger*, 338 Or 341, 108 P3d 1161 (2005) (*Knappenberger III*), this court found the accused guilty of one violation of DR 7-104(A)(1) (communicating with a represented person on subject directly related to representation), for conduct that took place in March 2000, and of one violation of DR 5-105(C) (former client conflict of interest), for his conduct in representing both parties in a divorce proceeding from October to December 2000."

*Id.* at 584-85. This court suspended the accused for 90 days in *Knappenberger II* and for 120 days in *Knappenberger III*. As of the time this case was submitted, the accused had served

the one-year suspension ordered in *Knappenberger IV*, but had not applied for reinstatement. *See* BR 8.1(a)(iv) (requiring application for readmission for an attorney "suspended for misconduct for a period of more than six months").

■    We weigh prior disciplinary offenses according to several factors, including:

> "(1) the relative seriousness of the prior offenses and resulting sanction; (2) the similarity of the prior offense to the offense in the case at bar; (3) the number of prior offenses; (4) the relative recency of the prior offense; and (5) the timing of the current offense in relation to the prior offense and resulting sanction, specifically, whether the accused lawyer had been sanctioned for the prior offense before engaging in the offense in the case at bar."

*Knappenberger IV*, 340 Or at 585 (internal quotation and citation omitted). Considering the accused's disciplinary record in light of those factors, some of his earlier offenses weigh heavily, while others do not. As in *Knappenberger IV*, we assign little weight to the stipulation, but we consider the offenses in *Knappenberger II* and *Knappenberger III* to be serious. *See Knappenberger IV*, 340 Or at 585-86 (so concluding). We also conclude that the offense in *Knappenberger IV* was serious because it was for neglect of a legal matter and that neglect occurred over a significant period of time "during which the accused was reminded numerous times of his obligations and had ample opportunity to rectify the situation." *Id.* at 588. The offenses in *Knappenberger III* and one of the two offenses in *Knappenberger II* all occurred within a few years of each other and within a few years of the offenses in this complaint—between 1999 and 2004. What we have stated twice before concerning the accused is even more true at this juncture:

> "[T]he accused's offenses, taken together, present an unsettling record of violating the disciplinary rules. Indeed, they carry significant weight in aggravation, because their presence demonstrates that the accused is careless with respect to his ethical obligations."

*Knappenberger IV*, 340 Or at 586 (internal quotation marks and citations omitted).

Reducing the weight of those prior sanctions, however, is the fifth factor that we listed in *Knappenberger IV*, the timing of those prior sanctions in relation to the current matters. The Miller matter occurred before this court's decision in *Knappenberger II*, and the Albright matter occurred before *Knappenberger III*. Additionally, the current offenses are violations of different disciplinary rules than were involved in the prior sanctions. In *In re Wyllie*, 331 Or 606, 19 P3d 338 (2001) (*Wyllie III*), this court concluded that it should not give the accused's two prior sanctions much weight because they were for different offenses and because the sanctions in those earlier cases had been imposed after the conduct at issue in *Wyllie III*. *Id*. at 623 ("Although the accused's prior offenses were serious and resulted in lengthy suspensions, under this court's case law, we do not give them much weight in determining the appropriate sanction in this case."). In *In re Huffman*, 331 Or 209, 13 P3d 994 (2000), we summarized our prior conclusions on the "timing of prior sanctions" issue.

> "As explained in [*In re*] *Jones*, [326 Or 195, 200, 951 P2d 149 (1997)], especially important is 'whether the accused lawyer had been sanctioned for the prior offense before engaging in the offense in the case at bar.' *Id*.; *see also In re Wyllie*, 327 Or 175, 183, 957 P2d 1222 (1998) (that this court's decision in earlier case was rendered after second case had been concluded at trial panel level and briefed to this court diminished significance of prior discipline as aggravating factor); *In re Starr*, 326 Or 328, 347, 952 P2d 1017 (1998) (that events giving rise to prior discipline occurred at roughly same time as events giving rise to second proceedings somewhat diminished weight of prior discipline as aggravating factor, because accused lawyer's acts in second proceeding did not reflect disregard of an earlier adverse ethical determination)."

331 Or at 227-28.

We conclude that we should give moderate weight to the accused's prior disciplinary record. Although the prior offenses were, in the aggregate, serious, the current violations are of different disciplinary rules. Moreover, the Miller matter occurred before the earlier decisions, so the accused's behavior in that matter "do[es] not reflect a disregard of an

earlier adverse ethical determination." *In re Starr*, 326 Or 328, 347, 952 P2d 1017 (1998) (giving "moderate" weight to prior similar offenses that occurred at about the same time as offenses at issue).

**10.** The accused asks this court to take into consideration, as a mitigating factor in addition to his cooperation with the disciplinary process, the interim rehabilitation that he states that he undertook in response to prior sanctions that this court has imposed. We note, first, that we rejected "interim rehabilitation" as a mitigating factor in *Knappenberger IV* because the ABA had eliminated that mitigating factor from the ABA Standards and because, in that case, the panel found no evidence that the accused had engaged in any interim rehabilitation. 340 Or at 586 n 4. However, assuming that we would recognize "interim rehabilitation" as a mitigating factor in an appropriate case, the accused here has not demonstrated facts to support his claim of "rehabilitation" with respect to the disciplinary violations at issue here. That is because the accused's evidence focuses entirely on steps that he allegedly has taken to improve his practice in response to the sanctions imposed in the prior cases, including changes in the management of his practice to avoid conflicts of interest and neglect of legal matters. But "interim rehabilitation," as we have used that term, concerns steps that the lawyer has taken to prevent the reoccurrence of the violations at issue in the *current* case.[4] In *In re Starr*, this court considered, as a mitigating factor, steps that the accused took after the conduct at issue in that case to address that kind of conduct. 326 Or at 348. *See also In re Murdock*, 328 Or 18, 30, 968 P2d 1270 (1998) (considering, but rejecting, a claim of interim mitigation for steps taken after the misconduct at issue); *In re Koken*, 214 Or 357, 360, 329 P2d

---

[4] An accused's steps to change his practice in response to *prior* sanctions, which is a more accurate characterization of the accused's evidence here, is one factor that may be considered in weighing the seriousness of prior offenses. In *In re Jones*, 326 Or 195, 201, 951 P2d 149 (1997), this court stated that one of the reasons for analyzing prior offenses is to determine if an accused has "adapt[ed] his conduct in this case in response to being sanctioned" in prior cases. As such, whether an accused has taken steps to rehabilitate herself or himself in response to earlier sanctions can be a valid consideration when weighing the seriousness of prior sanctions as an aggravating factor. In this case, the evidence is inconclusive concerning whether the accused took effective interim rehabilitation measures in response to the prior sanctions.

894 (1958) (rejecting petition for reinstatement and discussing rehabilitation steps taken by the accused since the date of the violation that led to the sanction). The accused has not argued that he has taken any steps to rehabilitate his practice in light of the violations at issue in *this* case.

We turn to our prior cases involving similar disciplinary rule violations. In *Paulson*, this court publicly reprimanded a lawyer for violating DR 2-106(A). In that case, the accused lawyer charged a former client for time spent responding to a Bar complaint, 335 Or at 438-39, which is substantively similar to the accused's acts in the Albright matter. In *Paulson*, however, there was only one violation and no prior disciplinary record. In *In re Fadeley*, 342 Or 403, 153 P3d 682 (2007), this court suspended the accused lawyer for 30 days for violating DR 2-106(A) and other disciplinary rules in connection with a client fee issue. In other excessive or illegal fee cases the court has imposed somewhat longer suspensions, but those generally involved violations of additional rules or other aggravating circumstances. *E.g.*, *In re Balocca*, 342 Or 279, 151 P3d 154 (2007) (90-day suspension for violating DR 2-106(A) and other rules; aggravating factors present).

Based on those cases, the likely sanction for the accused's violations of DR 2-106(A) in the Miller and Albright matters, considering aggravating factors *other* than the accused's prior disciplinary record, would be a short suspension. The Bar, however, insists that the accused's prior disciplinary record requires that he be disbarred. Only by imposing that ultimate disciplinary sanction, the Bar argues, can the public be protected from the accused's repeated failure to conform his conduct to the rules that govern the legal profession. The Bar cites, as roughly analogous cases, *In re Bourcier*, 325 Or 429, 939 P2d 604 (1997) and *In re Bridges*, 302 Or 250, 728 P2d 863 (1986), where the court disbarred the accused lawyers. We do not find those cases helpful in deciding the sanction in this case. In those cases, the number of violations involved was several times the total number of violations involved in all of the accused's prior and current disciplinary proceedings. Also, in those cases, the accused

lawyers had failed to cooperate with the Bar, had been sanctioned more than once for violating the same rules, and had failed to appear in or respond to the final proceedings against them that resulted in disbarment. We understand the Bar's frustration with the accused and the reasons that it seeks disbarment. However, this court's prior cases indicate that the violations found here, even considering the accused's prior disciplinary record, do not warrant disbarment.

That said, the accused's many trips to this court, and the sheer number and variety of his disciplinary rule violations, demonstrate that something is seriously amiss in the accused's ability to practice law in conformity with the rules of the profession. His prior disciplinary record demonstrates that an enhanced sanction is warranted.

■ In *In re Chandler*, 306 Or 422, 760 P2d 243 (1988) (*Chandler III*), the accused attorney violated the same disciplinary rules (neglect of a legal matter and failure to turn over client property) for a third time, failed to cooperate with the Bar each time, and failed to appear in the proceeding in *Chandler III*. The Bar argued that he should be disbarred. Although the accused there violated the same rules repeatedly, had previously been suspended twice, and failed to cooperate with the investigation, this court rejected the Bar's request for disbarment and suspended the accused for two years. *Chandler III*, 306 Or at 431-32. There, as here, the violations, with one exception, occurred before the sanctions had been imposed. *Id. Chandler*, although obviously different from this case in a number of particulars, demonstrates that this court will use an accused lawyer's repeated prior violations to increase a sanction substantially, while reserving disbarment for the most aggravated misconduct. We find that precedent useful here. The accused's violations in this case merit a suspension; his multiple prior violations support an increase in the length of the suspension. Yet, as in *Chandler*, we cannot say that the violations under consideration, even considering the aggravating factors, justify the most severe punishment that this court can impose for professional misconduct. Rather, the accused's violations here call for a lengthy suspension.

For the foregoing reasons, we conclude that a two-year suspension is appropriate for the accused's two violations of DR 2-106(A), when considered in light of the aggravating factors and, particularly, the accused's past violations of the disciplinary rules.

The accused is suspended from the practice of law for two years, commencing 60 days from the date of filing of this decision.